CIVIL NO. 4:10-CV-00969-Y

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TILON LASHON CARTER,

Petitioner

v.

RICK THALER, DIRECTOR
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,

Respondent

BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS
(28 U.S.C. § 2254)

ROBIN NORRIS
Texas Bar # 15096200
Attorney for Petitioner
2408 Fir Street
El Paso, Texas 79925
(915) 329-4860

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

GROUNDS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    Ground for Relief One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

    Ground for Relief Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    Ground for Relief Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

TABLE OF AUTHORITIES

CONSTITUTIONS

U.S. CONST. amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. CONST. amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 24

U.S. CONST. amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 38

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 38


STATUTES

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TEX. CODE CRIM. PROC. art. 37.071, § 2(a) . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. CODE CRIM. PROC. art. 37.071, § 2(b) . . . . . . . . . . . . . . . . . . . . . . 18, 22

TEX. CODE CRIM. PROC. art. 37.071, § 2(c) . . . . . . . . . . . . . . . . . . . . . . . . 18

TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2) . . . . . . . . . . . . . . . . . . . . . . 32

TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1) . . . . . . . . . . . . . . . . . . 18, 19, 32

TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(2) . . . . . . . . . . . . . . . . 19, 20, 22, 24, 28

TEX. CODE CRIM. PROC. art. 37.071, § 2(g) . . . . . . . . . . . . . . . . . . . 19, 20, 23, 32

TEX. PENAL CODE § 12.31(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TEX. PENAL CODE § 2.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

TEX. PENAL CODE § 2.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

TEX. PENAL CODE § 2.03(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CASES

*Allen v. United States*, 164 U.S. 492 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Apprendi v. New Jersey*, 530 U.S, 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . 18, 21, 26, 28

*Avila v. Quarterman*, 560 F.3d 299 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Blakely v. Washington*, 542 U.S. 296 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 21-23, 26, 28

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Brooks v. State*, 990 S.W.2d 278 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . 37

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Carter v. State*, 2009 WL 81328 (No. AP-75,603 Tex. Crim. App. 2009) . . . . . . 1, 24, 37

*Cunningham v. California*, 549 U.S. 270 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Davis v. State*, 782 S.W.2d 211 (Tex. Crim. App. 1989) . . . . . . . . . . . . . . . . . . . . . . . 37

*Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ex parte Carter*, 2010 WL 5232998 (No. WR-70,722-01 Tex. Crim. App. 2010) . . . . . . 1

*Furman v. Georgia*, 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 178 L.Ed. 624 (2011) . . . . . . . . . . . . 8

*Hooks v. Workman*, 606 F.3d 715 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Jones v. United States*, 527 U.S. 373 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Jurek v. Texas*, 428 U.S. 262 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kansas v. Marsh*, 548 U.S. 163 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kerr v. Thaler*, 384 Fed. Appx. 400 (5th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kotteakos v. United States*, 328 U.S. 750 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Lawton v. State*, 913 S.W.2d 542 (Tex. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . 19

*Lockett v. Ohio*, 438 U.S. 586 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Lowenfeld v. Phelps*, 484 U.S. 231 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Mills v. Maryland*, 486 U.S. 367 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Mullaney v. Wilbur*, 421 U. S. 684 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Neder v. United States*, 527 U.S. 1 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Oliver v. Quarterman*, 254 Fed. Appx. 381 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . 24

*Paredes v. State*, 129 S.W.3d 530 (Tex. Crim. App. 2004) . . . . . . . . . . . . . . . . . . . . . . 21

*Patterson v. New York,* 432 U.S. 197 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Penry v. Johnson*, 532 U.S. 782 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Penry v. Lynaugh*, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Prytash v. State*, 3 S.W.3d 522, (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . 37

*Resendiz v. State*, 112 S.W.3d 541 (Tex. Crim. App. 2003) . . . . . . . . . . . . . . . . . . . . . 21

*Ring v. Arizona*, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21-26, 28

*Romano v. Oklahoma*, 512 U.S. 1 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rose v. Clark*, 478 U.S. 570 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Rowell v. Dretke,* 398 F.3d 370 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

v

*Sorto v. State*, 173 S.W.3d 469 (Tex. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 37

*Strickland v. Washington.* 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Thaggard v. United States*, 354 F.2d 735 (5th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Booker*, 543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Hill*, 234 F. Appx. 640 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Walton v. Arizona*, 497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Washington v. Recuenco*, 548 U.S. 212 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Woodfox v. Cain*, 609 F.3d 774 (5th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

RULES

TEX. R. APP. PROC., Crim. App. R. 1(a)(2), (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TREATISES & ENCYCLOPEDIAS

29 AM. JUR. 2d § 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Guy & Saint-Paul, 34 TEX. PRAC., *Jury Charge in Texas Civil Litigation* § 6.1 (3d ed.)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## STATEMENT OF THE CASE

Tilon Lashon Carter was convicted of capital murder in the 371st District Court of Tarrant County, Texas and sentenced to death on November 16, 2006.  Finding no error in the judgment, the Texas Court of Criminal Appeals  affirmed his conviction on January 14, 2009 in an unpublished opinion.  *Carter v. State*, 2009 WL 81328 (No. AP-75,603 Tex. Crim. App. 2009).  On September 5, 2008, Carter filed a post-conviction application for writ of habeas corpus in the courts of Texas, attacking his capital murder conviction.  After an evidentiary hearing, the convicting court filed its recommended findings of fact and conclusions of law, and ordered that they be transmitted along with the record to the Texas Court of Criminal Appeals (CCA).  On December 15, 2010, the Court of Criminal Appeals denied relief on the merits of Carter's constitutional claims in an unpublished written order, adopting some, but not all, of the factual findings and legal conclusions of the convicting court, as more fully described below. *Ex parte Carter*, 2010 WL 5232998 (No. WR-70,722-01 Tex. Crim. App. 2010).  Carter petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, to review the legality of his confinement and sentence of death under the state court judgment.

1

## STATEMENT OF FACTS [1]

Eighty-nine-year-old James Tomlin lived alone in a racially-mixed, working class neighborhood of Fort Worth.  (40 RR 24-25, 62)  Having grown up during the Great Depression, he was suspicious of banks, and kept large sums of cash hidden in various parts of his house and car.  (40 RR 33-35, 54, 69, 193)  He was also fond of prostitutes and had a long-standing commercial relationship with Donna Lacy.  (40 RR 48, 50, 82-83, 93, 190-91, 204, 237)  There was no special affection between them, however, especially on her part. So, when Lacy's daughter, Leketha Allen, needed money, Lacy suggested that Leketha and her boyfriend, Tilon Carter, rob Tomlin, and she showed them where he lived.  (40 RR 94-95, 139-40, 236-38)

Early the next morning, Tilon and Leketha drove to the house.  (40 RR 140)  While Tilon waited in the car, Leketha approached a side door, where Lacy had told them Tomlin would be more likely to answer.  (40 RR 43-44, 140, 249-51, 253)  Tomlin did answer, but declined Leketha's invitation to party and asked her to leave.   Evidently, he was prepared for trouble, as he had come to the door grasping a hammer. (40 RR 34, 140, 254)  Seeing this, Tilon approached and, when Tomlin swung at him with the hammer, he knocked the old

---

[1]  References to the record of trial are made in conformity with the Texas Rules of Appellate Procedure, according to which the appellate record of the proceedings underlying the capital murder conviction Petitioner is challenging was prepared.  "CR" refers to the Clerk's Record of trial, formerly known as the Transcript, and "RR" to the Reporter's Record of trial, formerly known as the Statement of Facts.   Volumes are numbered consecutively, beginning with "I."  *See* TEX. R. APP. PROC., Crim. App. R. 1(a)(2), (b)(1).  "SX" refers to an exhibit introduced by the State, "DX" to an exhibit introduced by the defense.  "HRR" refers to the Reporter's Record of the state evidentiary hearing on Petitioner's application for writ of habeas corpus.  The Findings of Fact and Conclusions of Law of the state habeas court are abbreviated "FF" and "CL", respectively.

man down.  (40 RR 140)  He and Leketha then bound Tomlin with duct tape, hands behind

his back and ankles together.  (40 RR 140, 144)  They left him sitting upright against a wall

while they searched the house for money.  (40 RR 143)  Leketha noticed a jar of coins in the

kitchen and grabbed it.  (40 RR 143)  But, after a brief search of the premises, they found no

other cash, so they left, taking only the jar of coins and a shotgun Tilon had found in the

bedroom.  (40 RR 45, 140, 143-44)

Meanwhile, Tomlin's daughter had  been  trying to call him, and when he did not

answer the phone for longer than usual, she worried that something might have happened to

him.  But she was busy with other errands and couldn't find the time to check on him until

the afternoon.  (40 RR 37-38, 57)  When she did, she found him bound with duct tape and

lying face-down near the door where Tilon and Leketha had left him.  (40 RR 39-40, 59; see

also 41 RR 6, 9)  She knew at once that he was dead.  Stumbling back into the front yard, she

screamed for help.  (40 RR 40-41)  Some the neighbors responded quickly, and when they

noticed Tomlin's condition, called for the police and emergency medical assistance.  (40 RR

41)

Tomlin had, by then, been deceased for some time.  Police investigators processed the

scene for evidence.  (40 RR 175-77)  Homicide Detective Cheryl Johnson observed that

Tomlin's "hands and arms, legs and face, [were] all restrained with duct tape."  (40 RR 69,

167; see also 40 RR 305; 41 RR 152-54)  The tape around his ankles was moved and twisted,

indicating that he had struggled in an effort to free himself.  (40 RR 76)  The tape on his face

covered only about half of his mouth, and was folded back on itself as if Tomlin had tried to remove it by rubbing his face against the carpet.  (40 RR 76, 77, 167; see also 41 RR 198, 202-203, 210-11)  Johnson also noticed a injury to Tomlin's head which had bled in a short stream across his face, suggesting that he was struck while immobilized.  (40 RR 74-76, 200)

An autopsy of Tomlin's body revealed a head wound, apparently sustained from a blow to the left side of his face.  (41 RR 151, 156-60)  The injury was not life-threatening, but it might have rendered him unconscious temporarily.  (41 RR 167-68; see also 40 RR 212-13)  Rather, it was clear to the medical examiner that Tomlin had died of asphyxiation. The manner of death was less certain.  (41 RR 180, 189-91)  Although ruled a homicide, that conclusion is always reached in cases where death occurs during, and is due in any manner to, the commission of a criminal offense.  (2 HRR 55, 65)  Except for a bruise or abrasion on Tomlin's inner lip (41 RR 169; see also 40 RR 164), the medical examiner would have concluded that he died from positional asphyxiation alone.  (41 RR 180-81)  Even a healthy young man can die of asphyxiation while bound as Tomlin was if he is placed in or falls into a prone position.  (41 RR 178, 205-206)  The risk of death in such circumstances is, of course, much greater in the case of an elderly man, such as Tomlin, who was in poor cardio-pulmonary health.  (41 RR 178; see also 40 RR 26)  But the injury to his inner lip also suggested to the medical examiner that he had been smothered, as such wounds are commonly observed in cases of smothering on account of the intense pressure necessary to deprive one of air by covering his nose and mouth.  (41 RR 172, 182-86; see also 40 RR 211-

4

12, 223)  Accordingly, the manner of death was listed as "smothering with positional asphyxia." (FF 4)

When later arrested, Tilon confessed to robbing Tomlin, but denied killing him.  (40 RR 100-105, 107-109, 137-38) He claimed that, when he and Leketha left the house, Tomlin was still alive, sitting upright, and apparently not in any kind of respiratory distress.  (40 RR 144-45)  The prosecution took a somewhat different view of the matter.  It inferred from the bruise inside Tomlin's lip that Tilon had deliberately murdered him, and it invented several scenarios to explain how he might have done it.  For example, Tilon could simply have covered Tomlin's mouth and nose with his hand, or have pushed Tomlin into a prone position and then stepped on the back of his neck, pressing his face into the carpeted floor until he expired.  (see 41 RR 182, 208)  Although, either of these methods would have required intense, continuous pressure for a period of five to ten minutes (41 RR 183), it was the state's position that the bruising inside Tomlin's lip made it clear that an attempt, at least, was made to smother him.

In spite of this, the prosecution called two witnesses to describe comments made by Tilon at different times in each of which he claimed that Tomlin was murdered by a different means altogether.  The first witness was one Nina Iglesias, an angry ex-girlfriend.  According to her, Tilon said that Leketha had shot Tomlin with a gun and that Tilon had then cut his throat with a knife.  (41 RR 66-67)  The state also produced the testimony of Daunshea Choice, Tilon's cellmate after he was arrested, who claimed that Tilon had told him Tomlin's

5

daughter actually committed the murder to collect insurance money.  (41 RR 137-38)  Not only were both of these witnesses patently unreliable, but the statements allegedly made by Tilon to Nina were plainly untrue and those made to Daunshea obviously speculative.  Why Tilon would have made either such statement, if he did, is not even intimated by anything else in the record of trial.  But it is certain from the forensic evidence that neither statement had anything at all to do with reality.  Indeed, what the forensic sciences established is that Tomlin's death came about in a way mostly consistent with Tilon's own statements to the police, and not with those supposedly made by him to Ms. Iglesias or Mr. Choice.  Accordingly, the only real contested issue at Tilon's capital murder trial was whether he intended to kill Tomlin or only to immobilize him while he and Leketha searched the house for money.

## GROUNDS FOR RELIEF

(1)  Petitioner was denied the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution because his trial attorneys failed timely to contact, confer with, and produce in court the testimony of a forensic pathologist to testify regarding the cause and manner of the victim's death.

(2) Petitioner was denied rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by failure of the trial court to require proof beyond reasonable doubt at the punishment phase of Petitioner's capital murder trial that no mitigating circumstances existed to warrant a sentence of life imprisonment rather than death.

6

(3)  Petitioner was denied rights under the Eighth and Fourteenth Amendments to the United States Constitution by the Texas statutory rule in capital murder prosecutions which requires the jury to be instructed that punishment-phase issues not be resolved in the defendant's favor unless at least ten jurors agree, and the statutory prohibition against informing the jurors that such agreement has absolutely no effect whatsoever on the judgment.

## ARGUMENT AND AUTHORITIES

### GROUND FOR RELIEF ONE

The duty of defense counsel under the Sixth Amendment to produce the testimony of favorable witnesses is subject to the familiar standard announced by the Supreme Court in *Strickland v. Washington*. 466 U.S. 668 (1984).  Counsel violates this duty when his failure can be said to fall below prevailing professional norms and, but for his unprofessional omission, there exists a reasonable probability the outcome of trial would have been different. *Williams v. Taylor*, 529 U.S. 362, 371 (2000).  An allegation that counsel should have called a particular witness at trial is, however, looked upon by reviewing courts with an extra measure of scepticism.  Especially when counsel makes a conscious decision not to use the witness, it is presumed that he acted consistently with his trial strategy or to avoid a tactical disadvantage.  To prevail on such a claim, therefore, a habeas petitioner "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would

7

have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2008).   The petitioner must establish these elements of his claim whether the uncalled witness was lay or expert.  *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010).

In spite of the heavy burden a habeas petitioner must bear in this connection, "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence."  *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 788, 178 L.Ed. 624 (2011).  At Tilon Carter's capital murder trial, the only critically disputed issue was whether he intended the death of James Tomlin. Indispensable to the state's contention that he did was the testimony of the Tarrrant County Medical Examiner, Dr. Nizam Peerwani, who was of the opinion that Tomlin died from asphyxiation, caused either by smothering or by being bound in a manner which ultimately made it impossible for him to breath, or by both.  Although he could not say for sure which was the immediate cause of Tomlin's death, it was clear from his testimony that he regarded Tomlin to have been killed deliberately by a human agent.  (FF 5)

In spite of Peerwani's belief, Tilon's defense counsel recognized early on that the evidence did not unambiguously prove Tomlin to have been the victim of an intentional act. (2 HRR 99-100, 111-12; 3 HRR 32-34)  Asphyxiation may occur accidentally when one is put in a position where his breathing is compromised, even if there is no intent to harm him. Tilon's inculpatory statements to the police, upon which the prosecution needed to rely for a conviction of any kind, maintained that Tomlin was alive and sitting upright when Tilon

8

left his house. If true, and if Tomlin later died of positional asphyxiation after falling or rolling onto his face, his death would have been due at most to Tilon's negligence or recklessness, and therefore not a capital offense.  Yet, because it seemed from Peerwani's autopsy report that he believed Tomlin had been intentionally smothered, even if positional asphyxiation also played a role, it was essential that Tilon's defense team include a forensic pathologist who could assist counsel to overcome or cast doubt upon the conclusion that intentional smothering was the actual cause of death.

Trial counsel did eventually retain, with funds authorized by the court, the services of Dr. Charles Harvey, a forensic pathologist in private practice, and formerly a protégé of Dr. Peerwani.  (2 HRR 5-7; 3 HRR 32-33, 38-39)  But Harvey was not actually retained to assist the defense until jury selection in the case was concluded and the trial itself was already underway.  (2 HRR 8, 88-89, 99, 101, 104, 113-15; 3 HRR 32-33)  It appears from the affidavits, and later the testimony, of Tilon's attorneys that they at first encountered some difficulty locating an expert who was both willing and affordable.  (2 HRR 87-88, 106, 108-109, 112; 3 HRR 30-31)  But, although one of them made a few unsuccessful inquiries soon after his appointment, he did not undertake an earnest search until it was too late to make any good use of the expert he eventually found.  (2 HRR 85)  His co-counsel, likewise did not become actively involved in looking for someone until the trial date was practically upon them.  (2 HRR 106-107)

While both attorneys later protested that some six or eight pathologists had been

contacted without success before they found Dr. Harvey (3 HRR 36), the passage of so many idle months without effort to complete such an essential part of their trial preparation effectively prevented them from realizing the benefit of Dr. Harvey's expertise. By the time they sent him pertinent autopsy records to review, Tilon was only a day or so from being convicted. (2 HRR 90-91, 116-17; 3 HRR 40-41) As a result, their entire opportunity to consult with him was limited to a few moments on the telephone, a conversation which Harvey himself does not even remember. (2 HRR 13, 42-43, 45-46, 71-72, 90-91; 3 HRR 45) What they took from that conversation is that Harvey agreed basically with Peerwani's conclusion as to the cause and manner of death, and so made a conscious decision not to use him at trial. (2 HRR 24-26, 48; 3 HRR 5-6, 42, 45-46, 53, 56) But Harvey did not purport to have reached any final or confident opinion in the case at that point. (2 HRR 72-73) What counsel did not learn until later, when Harvey provided them with a written report weeks after Tilon had been sentenced to death, is that there was more to say on the subject. (2 HRR 10-14, 48) Even then, one of Tilon's attorneys thought the report worse than he expected. (2 HRR 94-95, 118-22) The other was angered that it included material not mentioned by Harvey on the phone. (3 HRR 47-51) But neither of them, it now seems clear, understood how useful their own expert's testimony could actually have been because they never discussed the details of it with him in relation to their defensive strategy.

It is true that Harvey's report introduced two distracting hypotheses: that Tomlin had died from a heart attack and that he had been manually strangled, based on the appearance

10

of an injury to his neck in the autopsy photographs.  But Harvey never regarded the latter hypothesis as likely, and repudiated it at the evidentiary hearing of Tilon's state habeas application.  (2 HRR 36, 61-62, 69)  The suggestion of cardiac arrest was more likely to be true in Harvey's opinion, but impossible to confirm in light of the fact that Tomlin's death was most immediately caused by asphyxiation.  (2 HRR 37-38, 56-57)  By far the most important aspect of Harvey's opinion from a defensive viewpoint was that Tomlin might well have been left by Tilon in an uncompromised position, his breathing partly inhibited by the duct tape covering his mouth, and that he had then rolled or fallen onto his stomach in an effort to free himself, dying there of positional asphyxiation because he was unable to regain an upright posture.  (2 HRR 27-28, 58)

When they were later faulted in a Texas habeas corpus proceeding for their failure to involve Dr. Harvey or some other forensic pathologist sooner, both of Tilon's trial lawyers testified that they would not have used him any event because he would merely have reinforced the state's theory of the case, perhaps even making it worse by introducing strangulation as a potential cause of death.  (2 HRR 90-91, 95)  They said that they did not want to put on any expert who was unwilling to contradict Peerwani's findings with a conclusion that positional asphyxiation was the sole cause of Tomlin's death.  (2 HRR 83; 3 HRR 39)  Because their brief telephone conversation with Harvey left them with the impression that he could not do that, they made a conscious decision not to call him as a witness.  (2 HRR 90-91; 3 HRR 53)

11

The CCA, based on recommendations of the convicting court, concluded that defense counsel acted reasonably in their election to proceed without Dr. Harvey's testimony on the ground that it would only have strengthened the prosecution's argument that Tilon intentionally smothered Tomlin. (CL 6) The Court also found that counsel reasonably chose as a matter of trial tactics to make their case through cross examination of the Medical Examiner. (CL 6) But the CCA refused to adopt the recommended conclusion of the convicting court that defense counsel were not ineffective for failing to obtain the assistance of a forensic pathologist earlier in their preparation for trial. (CL 8) The CCA also rejected the conclusion of the convicting court that Harvey's findings did not differ significantly from those of Peerwani, probably because it is clear from the record that Harvey's interpretation of the evidence did shift the focus from deliberate smothering to positional asphyxiation.

Unlike Peerwani, Harvey suggested in his written report that Tomlin might have been left in an uncompromised position, and that his struggle to free himself could have been the act which put him into a posture ultimately resulting in his death. (2 HRR 26-28, 30, 58, 66-67) He interpreted Peerwani's conclusion that both smothering and positional asphyxiation were involved in Tomlin's death to mean, not necessarily that someone had intentionally occluded Tomlin's airways, but that a partial occlusion by the placement of duct tape over his mouth could have smothered him in light of his age and poor health, even if not intentionally or ultimately with fatal consequences. (2 HRR 73-74) Harvey also expressed the opinion in his testimony at the state evidentiary hearing, though not in his written report,

that the bruising inside Tomlin's lip could have occurred when duct tape was forcefully placed over his mouth.  (2 HRR 25-26, 31-32, 53)  It is significant that these differences, although they do not flatly contradict Peerwani's findings, are ones which, unlike Peerwani's, would have provided substantial expert support for interpreting the evidence in a manner more consistent with the defensive theory of unintentional homicide.

In the end, the CCA rightly concluded that defense counsel were deficient for failing to conduct a "prompt investigation" and that their delay getting an expert in spite of an early decision to develop a defensive theory based on lack of intent was not "a decision based on reasonable professional judgment."  (CL 14-16)  But, because the CCA also concluded that the cause of Tomlin's death necessarily involved intentional suffocation, even according to Dr. Harvey, Tilon was not prejudiced by the shortcomings of his defense counsel.  (CL 18-20)

In light of the evidence presented at the hearing of Tilon's state habeas application, this conclusion must be regarded as unreasonable.  As the CCA evidently acknowledged, the problem in this case begins and ends with defense counsel's failure to prepare, not just adequately, but at all.  Having rightly identified Tilons' most promising defense to be the Medical Examiner's uncertainty about the precise manner of death, it was unquestionably critical to the development of their case that they consult with an independent forensic pathologist from the outset of their representation to develop an effective approach to its presentation.

13

The issue at trial was not whether Tomlin died of natural causes, but whether he died from an act that was specifically intended by Tilon to kill him.  As a purely logical matter, that act could have been one of placing him deliberately in a position known by Tilon to cause death by asphyxiation or of smothering him in some manner, such as pressing his face into the floor while he was in a prone position, both of which possibilities were argued by the prosecution as reasonable inferences from the evidence.  It is clear, however, especially from testimony describing the unintentional asphyxiation of hog-tied criminal suspects by police officers in the past, that the former is not very likely.  (2 HRR 27-28)  If it was positional asphyxiation that killed Tomlin, it is almost certainly the case that Tilon did  not intend to kill him, at least not by the act of binding him face-down on the floor.  Accordingly, Tilon's conviction for capital murder, as opposed to some other version of homicide, such as felony murder, very likely depended on the jury's ultimate belief that Tilon smothered Tomlin in some manner with the intent to kill him, and that smothering was a sufficient cause of his death.

Clearly, defending against this conclusion was not simply going to be a matter of contradicting the Medical Examiner.  Peerwani  had identified positional asphyxia as a cause of death in his autopsy report, and that is exactly what defense counsel wanted the jurors to believe.  Their only difficulty was that Peerwani also identified smothering as a contributing cause, without being able to say how it was actually accomplished.  This subtlety was the real linchpin of the case, not heart attack or strangulation.  The challenge was to explain how

Tomlin got a bruise inside his upper lip, known by forensic pathologists everywhere to be associated  with smothering, if Tilon was not trying to kill him.

The Medical Examiner did not leave it open that any other explanation than intentional homicide was possible.  But Harvey, in his written report and testimony at the state evidentiary hearing, did.  A piece of duct tape forcefully placed over Tomlin's mouth could, in his opinion, have accounted for the injury.  He also characterized the placement of duct tape as a smothering event, even though it did not completely occlude Tomlin's air passages.  From the testimony of the police detective first on the scene it is apparent that duct tape had in fact been placed over Tomlin's mouth, and that he had rubbed most of it off while lying on the floor, trying to free himself, and gasping for air.

Had defense counsel procured Harvey's services sooner, and taken the time to consult with him at greater length and in greater detail about their defensive theory, it is clear that he would have been able to help them support a reconstruction of Tomlin's death more consistent with the theory that smothering was incidental to the act of muting Tomlin and that positional asphyxiation as the ultimate cause of his death.  It is simply not true, and plainly unsupported by the record, that Harvey thought Tomlin's death necessarily came about through an intentional act of suffocation.  The CCA's contrary finding was, therefore, unreasonable in light of the evidentiary record upon which its conclusion was based.

That Tilon was prejudiced by the shortcomings of his lawyers cannot seriously be doubted.  Everything about their actual strategy for his defense, the only strategy reasonably

suggested by the undisputed facts and circumstances of the case, was that Tilon had left Tomlin bound and gagged, but alive and breathing, near the place where his dead body was later discovered.  The state's theory was that Tilon had deliberately smothered Tomlin to death before leaving his house.  The only evidence supporting the state's theory was the testimony of the Medical Examiner.  Literally nothing else in the record of trial remotely provided the jury with a rational basis for believing that Tomlin was smothered apart from the testimony of Peerwani that he had a bruise on the inside of his upper lip which could not have been caused in any other way.

Dr. Harvey, who did not specifically disagree with anything in Peerwani's autopsy report, nevertheless inferred from that report and from the autopsy photographs that the bruising to Tomlin's inner lip could well have been caused by Tilon forcefully placing duct tape over his mouth.  Taken in combination with Tilon's confession and the investigative reports of the police, Harvey thought that the tape likely had a smothering effect on Tomlin because of his respiratory illness, even though it did not cover his nose, and that Tomlin died from positional asphyxiation when he rolled over onto his face in an effort to remove it.  This scenario provided an explanation for the manner of Tomlin's death, consistent both with smothering and with positional asphyxiation, which did not necessarily lead to the conclusion reached by Peerwani in his trial testimony that Tilon had intentionally caused Tomlin's death.

This may seem like a little thing, but it was the whole difference between capital murder and a lesser homicide offense in this case.  And it was the strategy actually adopted

16

by Tilon's attorneys for his defense at trial.  Nothing in their testimony at the evidentiary hearing of his state habeas application remotely suggested that they would have dispensed with Harvey's testimony had they realized that he was able to support such a scenario. Indeed, it is clear from their testimony that they did not realize he could support it even at the time of the state habeas hearing.  The reason is apparent.  They never consulted with him in the kind of detail obviously necessary to discern how his opinion actually benefitted their own defensive strategy.

To seriously conclude that Tilon was not prejudiced by this obviously deficient performance of his lawyers, one would have to believe that no reasonable juror could doubt Tilon's intent to kill Tomlin, even after hearing Harvey's testimony.  One would have to imagine that the possibility of an unintentional killing can be raised just as effectively through the cross examination of a state's expert who will not concede it as through the testimony of an equally qualified defense expert who affirmatively supports it.  One would have to believe that jurors do not really take the state's burden of proof seriously or that it is improbable even one of them would have lost confidence in the prosecution's theory after hearing from Dr. Harvey.  The truth is that, however subtle the differences between Peerwani and Harvey, they are the very differences upon which Tilon's conviction for capital murder unquestionably depended.  Because the jury never heard from an available defense expert in the filed of forensic pathology who would have provided support for the theory that Tilon did not intentionally kill Tomlin, it is impossible to be confident that the capital murder

17

conviction in this case was reached reliably.

GROUND FOR RELIEF TWO

"If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." *Ring v. Arizona*, 536 U.S. 584, 585-86 (2002). *See also Apprendi v. New Jersey*, 530 U.S, 466, 490 (2000).  Under Texas law, many facts must be found before a capital murder defendant's punishment can lawfully be assessed at death. Each and every element of one or more theories of culpability, as set out in section 19.03 of the Texas Penal Code, must be found.  It must also be determined that the defendant is likely to be a continuing threat to society and, if his culpability is predicated on the theory that he is criminally responsible for the conduct of another, it must be determined that he caused the death himself, intended that another cause death, or anticipated that a death would occur. TEX. CODE CRIM. PROC. art. 37.071, § 2(b).  Finally, if the defendant is found likely to pose a continuing threat to society, he may not be sentenced to death unless the jury unanimously finds that there is no "sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."  TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1).  Under Texas law, all of these findings, except the last, must be made by a jury convinced beyond reasonable doubt that they are true.  *See* TEX. PENAL CODE § 2.01; TEX. CODE CRIM. PROC. art. 37.071, § 2(c).  With respect to the last, the Texas Court of Criminal Appeals has held that no jury instruction on the burden of proof is necessary

18

because Texas law does not assign a burden on the question of mitigation.  *Lawton v. State*, 913 S.W.2d 542, 557-58 (Tex. Crim. App. 1995).

While it is true, of course, that no statute expressly prescribes a burden of proof on this question, Texas law does provide that "[t]he court shall charge the jury that in answering the issue . . ., the jury . . . may not answer the issue "no" unless it agrees unanimously and may not answer the issue "yes" unless 10 or more jurors agree."  TEX. CODE CRIM. PROC. art. 37.071, § 2(f)(2). What the jurors are not told, and may not lawfully be told under Texas law, TEX. CODE CRIM. PROC. art. 37.071, § 2(a), is that their failure to answer the issue at all will result in a sentence of "confinement in the institutional division of the Texas Department of Criminal Justice for life."  TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

A burden of proof is simply a way to determine who loses when the jury fails to make a particular finding of fact.  *See, e.g.*, 29 AM. JUR. 2d § 158.  The party with the burden of proof is the one who bears the risk of losing an issue if the fact-finder *fails to find* the issue true with the requisite level of confidence.  Thus, article 37.071, section 2(g) in fact prescribes a burden of proof for the mitigation special issue by providing that the defendant receive a life sentence if the jury both *fails to find* the issue true and *fails to find* it false. Because the jury may not answer that there are no mitigating circumstances merely because it *fails to find* that there are, it is the State which bears the actual burden of proof to convince the jury that the special mitigation question of article 37.071, section 2(e) should be answered negatively, since failure to convince the jury of this fact necessarily means that the defendant

will be sentenced to life in prison. In short, a capital defendant may never be assessed the death penalty in Texas under any circumstances unless a unanimous jury affirmatively finds that no sufficient mitigating factors exist.  It is not the defendant's burden to prove that such factors do exist, although the jury may find that they exist if ten or more of them believe it. Ultimately, it is the prosecution's burden to prove that there are no mitigating factors, and if it fails in this, the defendant may not be sentenced to death, whether he proved the existence of mitigating factors or not.

Accordingly, whenever a jury is accurately instructed as prescribed by article 37.071, section 2(f), the burden of proving that there are no sufficient mitigating circumstances to warrant a life sentence necessarily falls to the State by operation of section 2(g), whether the jury is so instructed or not.  What is not given by the statute is the standard of proof, or level of confidence, applicable before the jury is authorized to answer the mitigation issue negatively.  And that, of course, is a profound shortcoming, since *Ring* and *Apprendi* clearly require the standard to be "beyond a reasonable doubt" if a negative answer is prerequisite to imposition of the death penalty.  The elaboration and extension of *Apprendi* announced in *Ring*, therefore, makes it perfectly clear that Texas, having chosen to predicate death sentences on an affirmative finding by the jury that mitigating factors do not exist, is obliged by the Sixth Amendment of the United States Constitution to require that such finding be made by the jury beyond a reasonable doubt.  *Mullaney v. Wilbur,* 421 U. S. 684 (1975); *Patterson v. New York,* 432 U.S. 197 (1977).

Nevertheless, the Texas Court of Criminal Appeals has consistently refused to acknowledge the applicability of either *Apprendi* or *Ring* in this context. *See Resendiz v. State*, 112 S.W.3d 541, 550 (Tex. Crim. App. 2003), and *Paredes v. State*, 129 S.W.3d 530, 541 (Tex. Crim. App. 2004). In *Resendiz*, the Court of Criminal Appeals reasoned that:

> *Apprendi* applies to facts that increase the penalty beyond the 'prescribed statutory maximum.' Under Article 37.071 [of the Texas Code of Criminal Procedure], the statutory maximum is fixed at death. There are no statutory enhancements. A positive jury finding on the mitigation issue does not have the potential of increasing the penalty; rather, it has the potential to reduce a defendant's sentence.

Likewise, in *Paredes*, the Court insisted:

> "Nor does *Ring* support appellant's argument. *Ring*, like *Apprendi*, refers to an increase in penalty *over the statutory maximum*. In Texas, the statutory maximum for a capital offense is death. The mitigation issue does not increase the statutory maximum. To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory maximum."

Even after the Supreme Court further clarified the meaning of "statutory maximum" in *Blakely v. Washington*, 542 U.S. 296 (2004), the Court of Criminal Appeals remained unmoved, although the focus of it analysis shifted somewhat. In *Blakely*, the Supreme Court authoritatively rejected the CCA's apparent understanding of the phrase observing that:

> Our precedents make clear . . . that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* * * * The relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority.

21

542 U.S. at 303 (internal quotations and citations omitted).

Nevertheless, the Court of Criminal Appeals continued to deny that a negative answer to the mitigation special issue must be reached beyond a reasonable doubt, now holding not that the statutory maximum could be imposed even absent a negative finding on the mitigation issue, but rather that a negative finding on that issue is not really a finding of fact within the meaning of *Ring* and *Blakely*.

> It is, therefore, clear that what a jury is asked to decide in the mitigation special issue is not  a "[fact] legally essential to the punishment." . . . By the time the jury reaches the mitigation special issue, the prosecution has proven all aggravating "facts legally essential to the punishment."

*Perry v. State*, 158 S.W.3d 438, 448 (Tex. Crim. App. 2005).

It is certainly true that a capital felony is punishable by a range of either life imprisonment or death, under Section 12.31 (a) of the Texas Penal Code.  Death is the "statutory maximum" sentence in this sense.  Nevertheless, a jury verdict of guilty at the conclusion of the guilt phase of trial alone authorizes neither a life sentence nor the death penalty under Article 37.071.  While a capital defendant remains *eligible* for the death penalty upon the jury's guilty verdict, whether life or death will be imposed is contingent upon the resolution of further discrete issues.  Those issues are defined in Article 37.071, Subsections (b) and (e).  If, at the punishment phase of trial, the jury finds that the State has satisfied its burden of proof on the "future dangerousness" and "parties" (where applicable) special issues, defined in Subsection (b), the capital defendant remains *eligible* for the death penalty.  Even so, the trial judge has no authority yet to impose it.  He may, by this time, have

22

authority to impose *life* – if, for instance, the jury finds the State has *not* met its burden of proof, and therefore answers one of the Subsection (b) issues 'no,' or is unable to reach a verdict on either of those issues.  *See* Article 37.071, Subsection (g).  But the trial judge cannot yet impose death.  Not until the jury has addressed the further issue in Subsection (e) may he ever impose death; and then, he can only do so if the jury answers that special issue 'no.'  A 'yes' answer, or inability of the jury to resolve the mitigation issue one way or the other, results in a life sentence, under Subsection (g).

It does not matter whether one characterizes the jury's finding as a finding of fact. What matters is that the finding, whatever it is called, is legally essential under Texas law to the imposition of a death sentence.  As Justice Scalia wrote in his concurring opinion in *Ring*, "the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond reasonable doubt."  536 U.S. at 610.

Applying the constitutional definition of "statutory maximum" as explicated in *Ring* and *Blakely* to the Texas capital punishment scheme, the highest punishment the trial court can possibly impose "*without* [the] additional findings" required by Subsection (e) is a life sentence.  Until that point, in other words, the "statutory maximum" *is* a life sentence. *Blakely* thus makes clear, by its clarification of the definition of "statutory maximum," that *Ring*'s requirement of a jury verdict beyond a reasonable doubt for any punishment that is

23

contingent on a jury finding applies to the mitigation special issue embodied in Subsection (e) of Article 37.071.

In the instant case, Tilon Carter requested that the jury be instructed not to find an absence of sufficient mitigating circumstances unless convinced of that fact beyond a reasonable doubt. The trial court denied his request. When he later complained on direct appeal of that denial, the Court of Criminal Appeals simply referred to one of its recent opinions rejecting on the merits a similar claim and citing *Lawton* as authority. *Carter v. State*, 2009 WL 81328 at *5, Slip Op. at 10. Hoping for a different result, Tilon then raised the issue in his state habeas application, but was again denied relief because the complaint had already been resolved adversely to his position on direct appeal.

Claims such as this one, that the Sixth Amendment requires proof beyond reasonable doubt on the Texas mitigation special issue, have been disposed of time and again by the Fifth Circuit without addressing the issue as it is. Instead, its analysis typically includes the uncontroversial observation that a state may, without offending the United States Constitution, make it the defendant's burden to prove mitigating factors. E.g. *Oliver v. Quarterman*, 254 Fed. Appx. 381, 386 (5th Cir. 2007). But then, the Court leaps sideways to the conclusion that, because the Supreme Court did not envision its holding in *Ring* and other cases would apply to mitigating factors in death penalty cases, the state need not disprove such factors, no matter what the Texas legislature says about it. *Kerr v. Thaler*, 384 Fed. Appx. 400, 403 (5th Cir. 2011, cert. denied); *Avila v. Quarterman*, 560 F.3d 299, 314-15

(5th Cir. 2009, cert. denied); *Rowell v. Dretke*, 398 F.3d 370, 375-76 (5th Cir. 2005, cert. denied).

Of course, this misses the point altogether. *Ring* has nothing to say about what a state legislature wants to require as an element of proof in a criminal case. All it does is to hold what has now become a settled rule of constitutional jurisprudence – that whatever a state makes to be an element of proof upon which conviction or punishment depends must be proved by the state beyond a reasonable doubt a trial. And, whatever may be said about the Supreme Court's vision for the future of its opinion in *Ring*, there can be no doubt that the state of Texas really did mean to say that a defendant cannot be sentenced to death without a finding by the jury that any evidence offered in mitigation of his punishment is insufficient to warrant a lesser sentence.

Nor is there anything perverse about a statute that requires the state to disprove mitigating factors. The criminal law often places a burden on the prosecution to disprove defensive issues raised by the evidence. Such laws provide an additional level of confidence in the reliability of decisions about a defendant's guilt. To give a generic example, the Texas Penal Code effectively requires the prosecution to disprove all available defenses which have been raised by evidence from any source in a criminal trial by providing that a reasonable doubt on the issue must result in an acquittal. TEX. PENAL CODE § 2.03(d). Even more to the point, the prosecution must negate in its indictment any statutory exceptions to the alleged offense "and must prove beyond a reasonable doubt that the defendant or defendant's

25

conduct *does not* fall within the exception." TEX. PENAL CODE § 2.02 (emphasis added).

Requiring the prosecution to disprove the sufficiency of mitigating circumstances is likewise neither theoretically unusual nor practically impossible. There is no reason to think it astonishing that a state might require a similar safeguard against unreliable punishment decisions, especially in the death-penalty context, as it does against unreliable convictions. A statute such as the one here in issue appears on its face to do just that, and the federal courts should take its meaning to be what its plain language imparts, without second guessing what the Texas legislature actually intended or whether the Supreme Court would approve of it. It is what it is. All the United States Constitution does is to assign the burden and the standard of proof, just as it does for everything else the state has elected to make a condition of conviction or punishment. The question is not whether Texas could have put the burden on capital murder defendants to prove mitigation facts. It is whether, having put the burden on the prosecution to disprove them, the United States Constitution demands that they be disproved beyond a reasonable doubt, as in other cases where the prosecution must disprove a material fact.

Ultimately, under the rubric of *Apprendi*, *Ring* and *Blakely*, the rule of decision depends, not on whether some degree of discretion is involved in the punishment decision, but on whether the punishment actually assessed was authorized by the jury's verdict alone, and on whether that verdict was reached by the jury beyond reasonable doubt. *Cunningham v. California*, 549 U.S. 270, 284, 288-90 (2007). No one seriously disputes that a death

26

sentence in Texas may not be imposed without a jury finding that there are no mitigating circumstances sufficient to justify a life sentence.  Unlike indeterminate sentencing in which a judge is permitted discretion to assess punishment within a range prescribed by statute, based upon "facts that [he] deems relevant," *United States v. Booker*, 543 U.S. 220, 233 (2005), a jury verdict which fails expressly to include a finding that life imprisonment is unwarranted by the facts does not authorize the court to pronounce a sentence of death. *Cunningham*, 549 U.S. at 292 ("Factfinding to elevate a sentence . . ., our decisions make plain, falls within the province of the jury employing a beyond-a-reasonable-doubt standard, not the bailiwick of a judge determining where the preponderance of the evidence lies.").

Had the Texas legislature wanted to avoid the constitutional consequence of a jury finding on this question, it might easily have put the burden on capital defendants to convince the jury of their entitlement to a mitigated sentence or have expressly authorized the jury to balance aggravating and mitigating factors in arriving at an appropriate sentence. *Kansas v. Marsh*, 548 U.S. 163 (2006);*Walton v. Arizona*, 497 U.S. 639 (1990).  But it has long been the policy of Texas to comply with the guided discretion requirements of *Furman v. Georgia*, 408 U.S. 238 (1972), by withholding from jurors the ultimate decision of appropriate punishment in capital cases, and requiring them only to answer certain special punishment questions, from which the trial judge then determines what sentence to pronounce. *Jurek v. Texas*, 428 U.S. 262, 272 (1976).

This policy was continued when the legislature, in response to *Penry v. Lynaugh*, 492

U.S. 302 (1989), added a special punishment issue which, rather than call upon jurors to decide the appropriate punishment after considering all relevant circumstances, both aggravating and mitigating, instead instructed them only to make a finding that no circumstances particular to the defendant or his crime justified a life sentence. TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(1). Although both methods satisfy the constitutional requirement that jurors be empowered to effectuate mitigating evidence, the Texas method deliberately withholds from jurors the ultimate decision whether to impose a death sentence. Instead, it requires a determination from the evidence that sufficient mitigating circumstances do not exist in fact. Under *Apprendi*, *Ring*, and *Blakely*, assigning this task to the jury and making a death sentence unavailable unless the jury resolves it in a particular way, necessarily means that the jurors must be especially sure of the fact by finding it to be true beyond a reasonable doubt. The failure of Texas law to assign this standard of proof at the punishment phase of capital murder prosecutions, therefore, renders the law offensive to settled Supreme Court precedent.

Ordinarily, no harm analysis is indicated in such circumstances. Without an instruction properly requiring a jury finding to a level of confidence beyond a reasonable doubt, "there has been no jury verdict within the meaning of the Sixth Amendment[.]" *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993). As the Supreme Court in *Sullivan* elaborated: "[T]he essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of

28

proof, which vitiates all the jury's findings. A reviewing court can only engage in pure speculation – its view of what a reasonable jury would have done. And when it does that, 'the wrong entity judge[s] the defendant guilty.' *Rose* [*v. Clark*, 478 U.S. 570 (1986)], at 578." *Id*. at 281.

In spite of this, the Supreme Court has applied some version of the harmless error doctrine to unconstitutionally incomplete jury verdicts when the error does not affect the integrity of the entire verdict. Thus, in *Neder v. United States*, 527 U.S. 1, 10-12 (1999), the Supreme Court addressed the situation in which the verdict was not vitiated altogether by the absence of any reasonable doubt instruction, but in which the jury charge had merely omitted an essential element of the crime. The Court observed that, if an element is not the subject of significant dispute at trial, failure to submit it for jury consideration does not render the proceeding unfair or impugn its reliability. On the other hand, when a reviewing court "cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error – for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding – it should not find the error harmless." 527 U.S. at 19.

Since *Neder*, the Supreme Court has applied this approach to *Apprendi* errors on direct appeal. *Washington v. Recuenco*, 548 U.S. 212 (2006). It would therefore seem that, when raised in a collateral attack, such errors will be sufficient to set aside a judgment if, as in the case of other non-structural errors, they had a "substantial and injurious effect or influence

in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), quoting

*Kotteakos v. United States*, 328 U.S. 750, 776 (1948).  Such an effect is apparent where,

among other things, the issue upon which the trial court did not properly assign the burden

or standard of proof was a matter of significant contention between the parties.

Here, it is apparent that the possibility of a different verdict at the punishment phase

of Tilon's trial might well have been affected adversely by failure of the trial court to insist

that jurors not discount mitigating evidence unless convinced beyond a reasonable doubt that

it did not warrant a life sentence.  As in most capital murder prosecutions, ample testimony

was adduced by the defense to support a jury finding that mitigating circumstances existed,

and the question of mitigation was argued aggressively by both sides during their jury

summations at the punishment phase of trial.  (50 RR 6-43)  Clearly, the mitigation special

issue was vigorously disputed at Tilon's trial.

Moreover, the evidence adduced in support of mitigation was substantial.  Although

not mentally retarded, Tilon is of low general intellectual functioning, moderately depressed,

poorly socialized, and quick to anger out of proportion to the circumstances.  (46 RR 23-24,

247-303; 47 RR 6-131; 49 RR 161-232)  To a considerable degree, his behavioral and

personality disorders have been shaped by environmental factors.  (47 RR 53-54, 126; 49 RR

108-10, 112)  He was born to a 15-year-old, drug-addicted mother who suffered severe

mental illness and was unavailable to him during most of his minority.  (46 RR 12, 17, 38,

69, 161-62, 184, 196-97, 201, 204, 213-16)  Some of the men with whom she resided treated

him and his sister with extreme physical brutality.  (46 RR 27, 178-79, 205)  As a consequence, he was cared for during most of his early life by his maternal grandmother and her husband, both of whom were decent and supportive, but neither of whom was actively involved in directing his life toward positive values of responsibility and respect for lawful authority. (46 RR 5-31, 104-12, 127-29, 198, 206; 49 RR 110-12, 118) Accordingly, Tilon's trouble with the law began early, and the consequence was that he had difficulty finding gainful employment thereafter.  (46 RR 28-31, 41, 83, 150-51, 169)  As many others do, including most of those whom the prosecution procured to testify against him at trial, Tilon turned to the local economy of his neighborhood, dealing in illegal drugs and engaging in the ancillary criminality associated with it.  (46 RR 39-41; 49 RR 112)   The one positive influence in his life came from an older man who is now serving a long prison sentence for an undisclosed, serious criminal offense. (46 RR 33-35, 115-16, 181-82, 202-203, 206-207)

It is not that Tilon was without choices.  But none of those choices held the realistic promise of a better life, given his disadvantaged circumstances.  Putting him to death must have seemed to the jury more like swatting a fly than punishing a man for his crimes.  Had they been admonished that a higher level of certainty was required on the mitigation special issue, some of the jurors might well have concluded that Tilon's background and circumstances did warrant a sentence of life imprisonment rather than death after all.  The failure of Texas law and the trial judge to require such certainty very likely had a substantial influence on the jury's decision to conclude otherwise.

31

GROUND FOR RELIEF THREE

Jurors in Texas death penalty cases are told at the punishment phase of trial that they may not find the defendant to be a continuing threat or that sufficient mitigating circumstances do not exist unless they unanimously agree. TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(2). Ordinarily, an inability of jurors to reach the level of consensus required by law is tantamount to a failure of proof, necessitating judgment for the party upon whom the burden of proof does not rest. Guy & Saint-Paul, 34 TEX. PRAC., *Jury Charge in Texas Civil Litigation* § 6.1 (3d ed.). In fact, that is exactly what Texas law provides; an inability of jurors to agree unanimously on any of the punishment issues submitted of their consideration results in a judgment for the defendant. TEX. CODE CRIM. PROC. art. 37.071, § 2(g). But by also requiring an instruction that jurors may not affirmatively find in the defendant's favor unless ten of them agree, the law encourages them to believe that judgment will not be entered for the defendant unless they do. *Id*. at 37.071, § 2(d)(2), (f)(2). This so-called "10-12 Rule" has absolutely no legal effect whatsoever because the same result is achieved if any number of jurors less than all of them fail to find in the prosecution's favor on these issues. Clearly, there must be some other purpose served by the instruction. Without question, that purpose is to mislead the jury about the consequence of its failure to reach a verdict.

Most questions entrusted to the jury are accompanied by an assignment of the burden and an instruction as to the standard of proof. Jurors commonly know, and the parties may

freely discuss with them, the consequence of every available option, including their failure to agree upon a verdict. But death penalty statutes, both in Texas and elsewhere, expressly forbid court officers to let the jurors know what will follow as a matter of law if they do not reach a verdict. Merely withholding such information from the jury is not ordinarily offensive to the United States Constitution. *Jones v. United States*, 527 U.S. 373, 381-84 (1999). But when coupled, as in Texas, with an instruction that the jury may not find in the defendant's favor unless ten jurors agree, the law has a coercive effect. In short, it uses a diversionary jury instruction to disguise the consequence of the prosecution's failure to meet its burden and to create a false impression with the jury that failure to reach agreement one way or the other will result in another trial. This stratagem is plainly meant to exert pressure on jurors to abandon individual conviction in order to reach a consensus on the basis of a mistaken belief about what would otherwise be the consequence of their unreconciled differences.

This is especially true when it comes to the mitigation special issue. The reliability of a verdict from which a death sentence follows does not depend only on making relevant aggravating and mitigating evidence available to the jury, or by assuring that jurors have a means of expressing their reasoned moral response to such evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion). Reliability also ultimately depends upon the power of each juror to decide for himself what evidence is mitigating and to balance the weight and significance of that evidence against

aggravating factors according to his own opinion of its importance. That is why a law which requires jurors to agree upon mitigating factors in reaching an opinion about the propriety of capital punishment is offensive to the United States Constitution. *Mills v. Maryland*, 486 U.S. 367 (1988). Each juror in a capital case must have the freedom to vote against the death penalty for his own reasons. The government may not require unanimity of opinion or substantial agreement among jurors to support a finding that mitigating factors exist.

The Texas statutory prohibition against informing jurors that the consequence of their failure to agree will be a sentence of life imprisonment undermines this settled principle of Supreme Court jurisprudence, and is reminiscent of the jury instruction condemned in *Penry v. Johnson*, where jurors were required to answer a special issue falsely in order to express their conclusion that punishment should be mitigated to life imprisonment. 532 U.S. 782, 798 (2001). While the prohibition of section 2(a)(1) does not require jurors to lie, and does not produce an internally inconsistent jury charge, it does deliberately create a misunderstanding of the legal consequences which necessarily follow from unreconciled differences of opinion, with the manifest purpose of coercing jurors who hold a minority view into changing their position for the sake of reaching a verdict. Compare *Lowenfeld v. Phelps*, 484 U.S. 231, 235, 237 (1988).

Of course, there are many things about the law that jurors aren't told in the court's charge. Most, of course, are aspects of the law which have no application to the case. Jurors are given instructions about the laws they must apply to resolve the issues before them.

34

These may include admonishments of the jury's duty to reach a unanimous verdict and of the consequences which may follow from their failure to do so. Jurors are typically cautioned that they should give fair consideration to the views of other jurors and that they should be open to changing their minds if they can do so without sacrifice to individual judgment. *Allen v. United States*, 164 U.S. 492, 501 (1896). In circumstances where they are deadlocked, the court may further instruct them that agreement is important because trials are time-consuming and expensive, and because it is unlikely that a second jury will find it any easier to resolve the issues. See, e.g., *United States v. Hill*, 234 F. Appx. 640, 644 (5th Cir. 2009); *Thaggard v. United States*, 354 F.2d 735, 738 n.2, 739 (5th Cir. 1965, cert. denied).

Such so-called *Allen* charges thus encourage jurors to reexamine their individual judgments of the case, not only by giving fair consideration to the opposing views of their colleagues, but by considering the social costs associated with having to begin the trial over again with a different jury. It is an attempt to achieve unanimity in spite of unreconciled differences of opinion. The statutory prohibition of section 2(a)(1), taken in combination with the instruction that jurors may not find for the defendant unless ten of them agree, has the same objective. But, unlike the *Allen* charge, it purposefully attempts to do so, not by honestly informing jurors that the actual consequence of a failure to agree will likely be another expensive trial, but by dishonestly promoting the belief that another expensive trial will be necessary when, in fact, it will not. If an *Allen* charge is constitutionally acceptable because it frankly and accurately promotes the legitimate interest of our system to achieve

35

unanimity, surely it cannot be acceptable to achieve the same desirable result through a subterfuge which has as its obvious purpose, not to impart relevant truth, but instead to promote false belief.

When, during deliberations, a Texas juror changes his answer to the mitigation special issue from "yes" to "no" on the basis of a social cost analysis,  he necessarily agrees to find that a circumstance he actually believes to be mitigating, or that a mitigating circumstance he actually thinks sufficient for a life sentence, is not.  If he changes his vote because convinced that his initial conclusion was wrong, even if influenced to reconsider it by an awareness that failure to reach agreement will entail a social cost, the chance that individual judgment will be subordinated to group pressure may well be a risk due process can reasonably bear.  But, when a juror changes his vote because deliberately misled to believe that a social cost is involved, when it is not, one can hardly maintain that the sacrifice of individual judgment is consistent with settled objectives of the Eighth and Fourteenth Amendments.  Cf. *Hooks v. Workman*, 606 F.3d 715, 742-44 (10th Cir. 2010) (not instructing on effect of failure to agree contributed under the circumstances to misleading the jury and coercing a unanimous verdict to impose the death penalty).

Misleading jurors about the consequences of their actions in a death penalty case impugns the reliability of their sentencing decision under settled Supreme Court jurisprudence. *Romano v. Oklahoma*, 512 U.S. 1, 8 (1994).  *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985).  Tilon Carter complained on direct appeal and in his state habeas

application that the Texas statutory instructions regarding the punishment-phase special issues had such an  effect on the death sentence in his case.  In both instances, the CCA resolved the question by citing a number of cases from its own jurisprudence in which the issue had been resolved on its merits contrary to Tilon's position.  *Carter*, 2009 WL 81328 *4, *Slip Op.* at 9-10.  The opinions in these cases relied in turn upon earlier holdings of the court which reasoned that acquainting jurors with the consequence of a deadlock would provide an incentive for them to avoid their deliberative responsibilities.  *Sorto v. State*, 173 S.W.3d 469, 492 (Tex. Crim. App. 2005, cert. denied); *Prytash v. State*, 3 S.W.3d 522, (Tex. Crim. App. 1999, cert. denied); *Brooks v. State*, 990 S.W.2d 278. 288 (Tex. Crim. App. 1999, cert. denied); *Davis v. State*, 782 S.W.2d 211, 221-22 (Tex. Crim. App. 1989, cert. denied).

Ironically, although the complaint presented in these cases had to do with the alleged unconstitutional effect of the rule that ten jurors must agree to render a punishment verdict for the defendant, the CCA addressed only the argument that jurors should be told the consequence of their failure to agree, and not the central argument that the 10-12 Rule itself deliberately misleads them into believing that their failure to agree will not result a judgment for the defendant.  The omission is significant.  If it were only a matter of promoting conscientious deliberation and avoiding the early abandonment by jurors of their duty to reach consensus, a rule which blocks the defendant from making a frank appeal for deadlock would be easy to understand and approve.  But fooling the jury with a superfluous instruction that judgment cannot be rendered for the defendant unless there is substantial agreement, and

then prohibiting the court officials from exposing the superfluity, is nothing but a naked effort to influence a change of position by minority jurors under a regime where any such change of position will necessarily result in more, rather than fewer, death sentences because unreconciled differences of opinion always result in a life sentence anyway.

Because application of the Texas 10-12 Rule invariably has a coercive effect on jury deliberations and discourages each juror from expressing an individual judgment about which circumstances, if any, warrant a sentence of life imprisonment rather than death, it seriously compromised the reliability of the sentencing decision in Tilon Carter's capital murder prosecution.  Under settled Supreme Court precedent, therefore, failure of the trial court to inform, or to allow defense counsel to inform, jurors of the real effect which necessarily follows from their failure to agree on a verdict at the punishment phase of trial denied him substantial rights secured by the Eighth and Fourteenth Amendments to the United States Constitution.

CONCLUSION

For the foregoing reasons, this Court should set aside Petitioner's conviction for capital murder and sentence of death, and to order his release from confinement unless retried by the state of Texas within a reasonable time.

s/ Robin Norris
ROBIN NORRIS
Texas Bar No. 15096200
2408 Fir Street
El Paso, Texas 79925
(915) 329-4860
robinnorris@sbcglobal.net

ATTORNEY FOR PETITIONER

39

CERTIFICATE OF SERVICE

I hereby certify that, on December 6, 2011, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Kelli Weaver
Attorney General of Texas
Post-Conviction Litigation Division
209 W. 14th Street
Austin, Texas 78701


s/ Robin Norris