IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TILON LASHON CARTER, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| | § | 4:10-CV-00969-Y |
| | § | |
| | § | |
| | § | * DEATH PENALTY CASE * |
| | § | |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent, | § | |

## RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Tilon Carter (Carter) was properly convicted of, and sentenced

to die for, the brutal murder of James Tomlin.  In his petition for writ of habeas

corpus, filed pursuant to 28 U.S.C. §§ 2241 and 2254, Carter raises three claims

challenging the constitutionality of his presumptively valid state conviction and

death sentence.   However, Carter fails to demonstrate that the state court's

adjudication of his claims was objectively unreasonable, and he fails to

demonstrate that his claims merit relief or that relief is not precluded under

*Teague v. Lane*, 489 U.S. 288 (1989).  Therefore, Respondent Rick Thaler (the

Director) asks this Court to deny all habeas relief.

## CARTER'S ALLEGATIONS

The Director understands Carter to raise the following grounds for federal habeas relief:

1.   Carter received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments because his attorneys failed to timely contact, confer with, and produce in court the testimony of, a forensic pathologist regarding the cause and manner of James Tomlin's death.

2.   The trial court erred by failing to require proof beyond a reasonable doubt at the punishment phase of Carter's trial that no mitigating circumstances existed to warrant a sentence of life imprisonment rather than death, in violation of Carter's rights under the Fifth, Sixth, and Fourteenth Amendments.

3.   Carter's Eighth and Fourteenth Amendment rights were violated by the Texas death-penalty statute because it does not allow the jury to be instructed that if they cannot agree on an answer to the special punishment issues, a sentence of life imprisonment will be imposed.

*See* Carter's Petition for Writ of Habeas Corpus (Petition) at 6-11; *see also* Carter's Brief in Support of Petition for Writ of Habeas Corpus (Brief.) at 6-38. Carter has exhausted all of his claims.  Carter raised his first claim during state habeas proceedings.  He raised his second and third claims on both direct appeal and during state habeas proceedings.  The state court's denial of Carter's claims on the merits was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court; thus, these claims for habeas relief cannot be granted.

## STATEMENT OF THE CASE

Carter was indicted on December 10, 2004 for murdering James Tomlin during the course of committing or attempting to commit robbery. 1 CR[1] 2.   He was convicted of capital murder as charged in the indictment on November 1, 2006, in the 371st District Court of Tarrant County, Texas. 11 CR 2607.   After a separate punishment trial the jury answered the special issues such that the trial court imposed a death sentence. 11 CR 2617- 2619; 11 CR 2632-34.  Carter, represented by counsel, pursued an automatic direct appeal to the Texas Court of Criminal Appeals.   The court affirmed his conviction and sentence in an unpublished opinion. *Carter v. State*, No. 75,603 (Tex. Crim. App. January 14, 2009).  Carter's petition for writ of certiorari to the United States Supreme Court was denied on October 5, 2009.  *Carter v. State*, 130 S. Ct. 58 (2009).

Carter previously filed a petition for state writ of habeas corpus on September 5, 2008.   Following an evidentiary hearing, the trial court made findings and conclusions and recommended denial of habeas relief.  The Court of Criminal Appeals adopted the trial court's findings and conclusions "with the following exceptions: under Grounds for Relief 1 and 2, the second and third sentences of findings paragraph 24, and conclusions paragraph 8; under Grounds

---

[1]        "CR" refers to the clerk's record of pleadings and documents filed with the court during the trial, preceded by volume number and followed by page numbers.

for Relief 5 through 8, findings paragraph 6, and conclusions paragraphs 2 and 3." *Ex parte Carter*, No. 70,722-01 (Tex. Crim. App. 2010); SHCR[2] (unnumbered cover).  Based upon the trial court's findings and conclusions and, on its own review, the Court of Criminal Appeals denied relief in an unpublished order on December 15, 2010.

Carter filed his federal habeas petition in this Court on December 6, 2011. This response follows.[3]

## STATEMENT OF FACTS

### I.   Facts of the Crime

The Court of Criminal Appeals set forth the facts of the crime as follows:

[Carter] was charged with intentionally causing the death of James Eldon Tomlin, "by restraining him and causing him to lie face down and by smothering him by exerting pressure on his head or face with an object unknown to the grand jury," during the course of robbery. [Carter] gave two statements to Detective Cheryl Johnson, who read them to the jury.  In [Carter's] first statement, he told police that he and his girlfriend, Leketha Allen, had been talking about needing money when Leketha's mother suggested that they rob Tomlin, an elderly man who lived alone and kept large amounts of cash in his house.  Leketha's mother drove them to Mims Street and pointed out Tomlin's house.  The next day, [Carter] and Leketha drove back to Tomlin's house. [Carter] waited in the car while Leketha, who was acquainted with Tomlin, knocked on the back door.  After Tomlin opened the door, [Carter] walked up and

---

[2]      "SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court.

[3]      A copy of the state court record was overnighted to the court on March 26, 2012.

told Leketha to get back in the car.  Tomlin swung a hammer at [Carter] but he dodged it and ordered Tomlin to lie down.  Tomlin complied. [Carter] started looking around the house.  Leketha then walked into the house, and they both searched it.  She told [Carter] that Tomlin was going to get up and move, so [Carter] bound Tomlin's hands with duct tape.  He used a sock to hold the tape, and he tore the tape with his teeth.  Leketha took two jars of coins from the kitchen, and [Carter] took an old, long gun from the bedroom.  Leketha went back to the car.  [Carter] "came out last," and they drove back to Leketha's mother's house.

In his second statement, [Carter] indicated that he had borrowed a gun in preparation for the robbery and that he was holding it when he entered Tomlin's house.  He stated that after Tomlin swung the hammer at him, he grabbed Tomlin's arm and made him sit down on the floor.  When Leketha walked into the house, [Carter] gave her the gun to hold while he bound Tomlin's hands and feet with duct tape.  After they finished searching the house and Leketha went back to the car, [Carter] watched Tomlin for a minute to make sure he was all right.  Tomlin was sitting up with his legs straight out in front of him. [Carter] told Tomlin they were leaving, and Tomlin said, "Okay."

Tomlin's daughter and responding law-enforcement officers testified that Tomlin's body was found lying face down on the floor just inside that back door, with his feet blocking the doorway.  His hands were bound behind his back by duct tape that was wound around his wrists.  Duct tape was also wound around his ankles.  There was tape residue on his shirt and socks that was consistent with him having moved his arms and legs after they had been bound.  His face was turned to the side.  A piece of duct tape, partially folded over, was stuck to the side of his mouth area.  There were two bloody injuries on the top and the left side of his head.  Tomlin's glasses and a hammer with blood on the handle were found on the floor near his body.

A medical examiner testified that Tomlin's flesh at both his wrists and ankles had been compressed and his skin had been damaged by duct tape.  The lacerations on Tomlin's face and head were the result of blunt-force trauma that might have caused a

temporary loss of consciousness but no significant injury to the skull or brain. The inside of Tomlin's upper lip had been pressed hard against his teeth, resulting in a hemorrhaging injury. The nature of this injury indicated that it was the result of applying profound and sustained pressure against Tomlin's mouth for at least thirty seconds while he was still alive. The injury was typical of smothering, and it would not have resulted from the impact of a fall or from the weight of Tomlin's head as he lay on the floor.

The medical examiner further testified that, given the position of Tomlin's body when it was found and the evidence he had seen, Tomlin was bound while lying face down on the floor, and it would have been impossible for him to sit up and talk to anybody. The medical examiner acknowledged that most people probably would not understand the risk of death involved in binding someone in that position. However, he emphasized that he could not exclude smothering because the markings he had observed were "very consistent" with smothering. He ruled that the cause of death was "smothering with positional asphyxia."

[Carter's] ex-girlfriend testified that [Carter] told her that he and Leketha had killed an old white man during a robbery at a house on Mims Street. [Carter's] former cell-mate testified that [Carter] had tried to intimidate him by boasting that he and his girlfriend had killed an old man during a robbery.

*Carter v. State*, slip op. at 2-5 (footnotes omitted).

## II.   Evidence Relating to Punishment

### A.   State's evidence

The State presented evidence that Carter's criminal behavior dated back to his juvenile years.

As a teenager Carter punched two to three inch holes in the living room wall of his grandmother's house because his mother had made him angry. 43 RR

17-19.  Police Officer E.L. Ray, testified that when he arrived on the scene and spoke with Carter about the damage, Carter called his mother "hoes and bitches." *Id.* at 19-22.  Carter was handcuffed and as he was being led from the house, he lunged toward his mother threatening, "I'm going to kill you bitch.  I'm going to get my boys to take care of you." *Id.* Carter, who already had a referral and revocations for terroristic threat, was placed on juvenile probation for criminal mischief and terroristic threat.  *Id.* at 36,38.

Gregory Wesley, a juvenile probation officer for Tarrant County Juvenile Services testified that while Carter was on juvenile probation he took his grandfather's car without permission.  *Id.* at 44-45. When he returned the car, he struck his elderly grandfather in the face causing a cut to his brow.  *Id.* Nevertheless, his grandfather refused to press charges.  *Id.* at 44.

Jo Lynn Crouse testified that she and her husband were held at gunpoint in their apartment complex parking lot by a masked Carter.  He took their money and their car.  *Id.* at 119-27.  Carter confessed to Juvenile Detective Scott Pierce that he committed the crime to pay off a drug debt.  *Id.* at 150-59, 169-72, 177.  Carter was certified to stand trial as an adult for aggravated robbery and spent five years in the penitentiary.  *Id.* at 60-61; 46 RR 39-41.

Diana Del Santos Scott testified that Carter exposed his genitals to her when she was shopping at a K-Mart in Arlington, Texas.  *Id.* at 188-95.  His

pants were still unzipped when the police arrived and his semi-erect penis protruded through his zipper under his shirt. *Id.* at 206-07. Carter plead guilty to the misdemeanor offense of indecent exposure. *Id.* at 216.

Petrina Kelly, Carter's ex-girlfriend, testified that on December 8, 2002, Carter hit her in the face and bit her hand to prevent her from retrieving his key to her apartment. *Id.* at 222-23. He plead guilty to the offense. *Id.* at 242.

On December 24, 2003, only four months before he committed the instant capital murder, Carter, along with his friends Choice and B.J., robbed a drug house on North Littlejohn Street in Fort Worth, Texas, because Carter had "left money" there when he previously robbed it. 44 RR 141-44. After gathering the woman and two men inside the house into one bedroom, Carter ordered them to undress. *Id.* at 149-50. The woman resisted. Carter struck her in the face several times. *Id.* When she complied, he touched her female sexual organ with his gloved hand and bound her hands behind her with duct tape. *Id.* at 151.

Upon learning that the drugs and money had been moved to the house next door, Carter and B.J. took the younger man next door while Choice stayed behind to guard the woman and the older man. *Id.* at 152-54. When Carter and B.J. returned with the younger male and someone else, either Carter or B.J. ordered everyone inside the closet. *Id.* at 160-61. Carter fired his nine-millimeter handgun into the closet, killing the older man and injuring the

others. *Id.* at 43,45-46, 51-52, 116, 163-64, 166.

Choice admitted to police that he was present with others at the robbery-murder, but he denied being the shooter. *Id.* at 68-69,97-98. Choice was arrested, but no one else was ever apprehended in the case. *Id.* at 70, 88, 90. While Carter and Choice were in jail together in 2005, Carter told Choice in a note that he would clear Choice of the crime. *Id.* at 250-52. Carter told others about his involvement in the crime and admitted to one friend that he was the shooter. 44 RR 215-21,257-59.

The State also presented evidence of Carter's misbehavior while being incarcerated prior to trial. On August 30, 2005, a Tarrant County detention officer was picking up lunch trays when she noticed Carter and another inmate, Robert Argeris, fighting. 45 RR 44, 46. When the officer called "a code," Carter said, "[n]ow that she already called the code, I am going to finish beating your ass with this one arm," that had a cast. *Id.* at 48-49. Carter continued to beat Argeris with his cast, even after Argeris was in a fetal position on the floor trying to block Carter's punches. *Id.* at 50, 78. Argeris was transported to the hospital as a result of his injuries. *Id.* at 66-67.

According to James Criswell, Tarrant County sheriff's detention officer, Carter had exposed himself to commissary women on two occasions while in jail. *Id.* at 78-81. On one occasion, when officer Criswell terminated Carter's

commissary services and tried to have Carter return to his cell, Carter threatened to hit the officer in the head with his cast if he got too close. *Id.* at 80-81.

On August 31, 2006, as Carter was being taken out of his cell to go to court, he noticed some papers on the door and told the officer taking him out of his cell, "[m]y shit better be there when I get back, or there will be problems." 49 RR 39. Officers searched Carter's cell before he returned and found medications that Carter had hoarded, crushed glass and a razor blade. *Id.* at 39, 46.

Finally, the State presented rebuttal evidence from Dr. Timothy Proctor, Ph.D., that contradicted Carter's evidence of mental retardation and demonstrated that Carter had a psychopathic personality and would pose a future danger. *Id.* at 161-232.

## B.   Defense evidence

The defense presented extensive testimony about Carter's childhood and family dynamics. 46 RR 4-224. Gloria Carter, Carter's grandmother, testified that she and Louis Hodge, with whom she maintained a common-law relationship for over forty-two years, raised Carter. *Id.* at 5-9. She took Carter to church most Sundays. *Id.* at 51. Carter was her daughter Diane's son. *Id.* She testified that for awhile Carter was "sickly" as a child but got better. *Id.* at

10-23.   Carter was picked on in school because of the clothes he wore and because Louis was not his father.  *Id.*  He had some learning problems and speech problems, and he was in special education in elementary school.  *Id.*  She further testified that for awhile her daughter tried to raise Carter and his other siblings but that her live-in boyfriend at the time, Danny Bayers, abused them.  *Id.* at 26-27.

During his teen years, Bobby Reed and a man named Cory acted as father-figures to Carter, teaching him to work on motorcycles and encouraging him in school.  *Id.* at 31-36.  In high school, Carter had a lot of friends, but Gloria worried that some were gang members.  *Id.* at 39-41.  When he was around sixteen, Carter's girlfriend, Amy, got pregnant.  *Id.* at 42.  Carter worked "his self to death trying to work on cars, everything, with Cory to try to keep her hair up, nails, and she was - - proud of him."  *Id.*  During this time, Carter went to county jail for sometime but when he got back, he went to night school at Dunbar High School and also worked on cars and roofs to pay the bills.  *Id.* at 42-44.  Finally, Gloria asked the jury to let Carter come home with her because she loved him very much and needed his help at home.  *Id.* at 47.

Jerome Carter, Carter's brother, testified that Carter was a good father to his children, taking them to the park every day, out to eat, and birthday parties.  *Id.* at 88-92.  He also testified that his brother was "the kind of person that

helped others." *Id.* at 92-93.  Finally, he stated his belief that his brother was innocent and asserted that Carter turned himself in to show people that he did not do it.  *Id.* at 95.

Louis Hodge testified that he helped Gloria Carter raise Carter.  He bought Carter a bicycle, tricycles, and clothes.  *Id.* at 107.  He helped him when he needed something because he loved him.  *Id.*  Hodge also bought Carter a horse that Carter loved and took care of.  *Id.* at 112-113.  Carter cried when he lost the horse because the city took it away.  *Id.*  Hodge taught Carter to work on cars and how to do roofing and sheetrock work.  *Id.* at 108-09.  Carter was not violent toward Hodge or Gloria.  *Id.* at 109.  Hodge asked the jury to spare Carter's life.  *Id.* at 118.

Rosita Bryce testified that she was Carter's neighbor for six years and that Carter was always very polite to her, her husband, and children.  *Id.* at 132-36. Carter always offered to help with anything she needed, such as working on cars and cutting her lawn.  *Id.*  She testified that she could not believe Carter had committed capital murder and asked the jury to spare his life.  *Id.* at 138-39.

April Cleaver, the mother of one of Carter's children, testified that Carter was a good and loving father.  *Id.* at 149-54.  She asked the jury to spare his life for her daughter.  *Id.* at 154.

Diedra Davis, Carter's current girlfriend, testified that Carter loved his

12

children and was a good father and a good person. *Id.* at 164-66. Carter was supportive of her in her schooling, sometimes even helping her financially. *Id.* at 168. She further testified that Carter tried to find work but was frustrated because of difficulty due to his prior convictions. *Id.* at 169. She expressed disbelief that Carter could have committed the instant offense because "he's always out there trying to help others, always," "especially kids" or "older folks." *Id.* at 170.

Terrlouyn Carter, Carter's sister, testified her mother had many men and that one of them, Danny Bayers, abused her and Carter when they were young. *Id.* at 179. Bayers often yelled at them, whipped them, and slammed them against the wall punching holes in the wall near their heads. *Id.* at 178. She further testified that Carter loved and took care of his horse and was not a bad person. *Id.* at 183-86.

Carter's mother, Diane Carter, testified that she first became pregnant at age fourteen and is the mother of eight children, each with a different father. *Id.* at 194-96. She asserted that Carter's father is Harold Swan, her cousin or step-cousin. *Id.* at 196. As a young girl after Carter was born, she began running away from home and did so numerous times. *Id.* at 197-98. She did drugs off and on and used crack cocaine in her twenties. *Id.* at 201, 217. Bobby Reed was a father figure to Carter. *Id.* at 203-03. She also described the abuse

13

that she, Terrlouyn, and Carter suffered at the hands of Danny Bayers. *Id.* at 205-06.   When she spent time at home with Carter, he would complain to her about not taking medication for her tumor. *Id.* at 208.   She used to drink wine but does not do so now because of her medications. *Id.* at 214.   She hears voices all of the time, "mostly of her dead grandma." *Id.*   She was hospitalized at Trinity Springs for a while after she came out of "MHMR." *Id.* at 216.   She expressed her belief that her son was innocent and asked the jury to "just let him have life." *Id.* at 217-18.

Dr. Richard Schmidt Ph.D., testified that Carter is borderline mentally retarded and would not be a future danger in prison. *Id.* at 247-304, 299-300; 47 RR 66-132.

## STANDARD OF REVIEW

Confined pursuant to a state court judgment, Carter is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).   Thus, any claims Carter raises which are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims which are either unexhausted and procedurally defaulted, or claims which were exhausted yet were dismissed in a successive state habeas application and, thus, are also

14

procedurally defaulted.  Indeed, under the AEDPA, a federal habeas application

shall not be granted unless:

> (A)   the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)   (I)   there is an absence of available State corrective process; or
>
>          (ii)   circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  Moreover, a writ may be denied on the merits,

notwithstanding any failure to exhaust available state court remedies.  28 U.S.C.

§ 2254(b)(2).

Regarding exhausted claims, under the AEDPA, federal habeas relief

based upon claims that were adjudicated on the merits by the state courts

cannot be granted unless that adjudication:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has explained that a state court

decision is "contrary to" clearly established federal law if the state court "applies

a rule that contradicts the governing law set forth in [the Supreme Court's]

cases," or confronts facts that are "materially indistinguishable" from relevant

Supreme Court precedent but reaches an opposite result. (*Terry*) *Williams v. Taylor*, 529 U.S. 352, 405-06 (2000 ).

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407-09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or … could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's only decision that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both

16

incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d) creates a difficult to surmount and "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id*.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court litigation of claims already rejected in state proceedings. It preserves the authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state court criminal justice systems, not a substitute for ordinary error correction through appeal."

*Id*. (emphasis added, internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th

Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion[.]").  And a state court's decision need not expressly cite any federal law or even be aware of applicable Supreme Court precedent in order to be entitled to deference.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent).

If the Supreme Court has not "broken sufficient legal ground to establish [a] … constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standard.  (*Terry*) *Williams*, 529 U.S. at 381.  Stated differently:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 131 S. Ct. 786-87 (emphasis added).  And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme

Court "before it can apply it to the facts at hand" because such a process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. at 666.

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "This presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time—i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an

19

"unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254 (d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001).  For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2).  (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273.  But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.  *Clark v.*

*Johnson*, 227 F.3d 273, 284-85 (2000).

## ARGUMENT

### I.   Carter Cannot Demonstrate that the State Court's Resolution of His Ineffective Assistance of Counsel Claim Is Unreasonable.

Carter contends that trial counsel were ineffective for failing to timely contact, confer with, and produce in court, a forensic pathologist to testify regarding the cause and manner of James Tomlin's death.  Brief at 9-17.  The state court rejected these claims, SHCR 137-45, and this decision was not objectively unreasonable.

In order to establish a Sixth Amendment ineffective-assistance-of-counsel violation, Carter must affirmatively prove that: (1) in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., counsel's performance was deficient under "prevailing professional norms;" and (2) the resultant prejudice was "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 690.  The failure to prove either element is fatal to the claim. *Id.* at 697.

In applying the "deficiency" prong, judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight" and to "evaluate the conduct from counsel's perspective at the time." *Id.* at 689-90; *Wiggins v. Smith*, 539 U.S. 510, 523

(2003).  Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance," and Carter must overcome the presumption that, under the circumstances, counsel's actions might be considered sound trial strategy.  *Strickland*, 466 U.S. at 689.

Counsel has a duty to make reasonable investigations on behalf of his client.  *Id.* at 690-691.  Further, "'strategic choices made after [a] thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after [a] less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'"  *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91).

Even if counsel's representation was  deficient, Carter must demonstrate prejudice by showing a reasonable probability that, but for counsel's deficiencies, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.  In determining whether a petitioner has shown prejudice, a reviewing court must "consider all the relevant evidence that the jury would

have had before it if [the defendant] had pursued a different path-not just the . . . evidence [the defendant] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 130 S. Ct. 383, 387 (2009).

On federal review, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009). Accordingly, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult.  The standards created by *Strickland* and [AEDPA] are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (internal citations omitted).  Carter is entitled to relief only if this Court concludes that the state court's determination that Carter did not satisfy *Strickland* was objectively unreasonable under 28 U.S.C. § 2254(d). *Richter*, 131 S. Ct. at 785 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard."); (*Terry*) *Williams*, 529 U.S. at 391; *Busby v. Dretke*, 359 F.3d 708, 717 (5th Cir. 2004).

Carter asserts the only critically disputed issue at his trial was whether he intended the death of James Tomlin.  And had his counsel timely sought and

retained a forensic pathologist such as Dr. Harvey, or someone like Dr. Harvey, Carter could have negated testimony by the Tarrant County Medical Examiner, Dr . Peerwani, that he believed Tomlin had been intentionally smothered, even if positional asphyxiation also played a role.  Brief at 9.  Carter contends that given his inculpatory second statement to the police that Tomlin was alive and sitting up when Carter left, it was essential that his defense team include a forensic pathologist who could assist counsel to overcome, or cast doubt upon, the conclusion that intentional smothering was the actual cause of death.  *Id.* at 8-9. The defense hoped to prove that after Carter left the house, Tomlin died of positional asphyxiation after falling or rolling onto his face, thereby rendering his death a result of negligence or recklessness and not a capital offense.  *Id.* at 9.

Carter complains that although trial counsel contacted some six or eight pathologists without success before they found Dr. Harvey, his counsel were deficient for "allowing the passage of so many idle months without effort to complete such an essential part of their trial preparation" which "effectively prevented them from realizing the benefit of Dr. Harvey's expertise.  By the time they sent him pertinent autopsy records to review, [Carter] was only a day or so from being convicted."  *Id.* at 10.  Because trial counsel made the strategic decision not to present the testimony of Dr. Harvey based on a phone

24

conversation during trial and before receiving Dr. Harvey's written report, Carter argues, they missed the most important aspect of the case from a defense perspective—the suggestion from Harvey's report that Tomlin might have been left in an uncompromised position and that his struggle to free himself could have been the act which put him into a posture ultimately resulting in his death. *Id.* at 11-12. Carter asserts that Dr. Harvey interpreted Dr. Peerwani's conclusion that both smothering and positional asphyxiation were involved in Tomlin's death to mean not necessarily that someone had intentionally occluded Tomlin's airways, but that a partial occlusion by the placement of duct tape over his mouth could have smothered him in light of his age and poor health, even if not intentionally or ultimately with fatal consequences. *Id.*

Counsel for Carter offered affidavits and testimony at an evidentiary hearing during state habeas proceedings. SHCR 12-14; 24-27; 2 SHRR 81-130; 3 SHRR 3-144. Dr. Harvey also testified at length during the state habeas hearing. 2 SHRR 4- 77. Following the hearing, the state habeas court made extensive findings of fact and conclusions of law. Although the state court concluded that counsels' trial strategy was reasonable, it also concluded that counsel was deficient in failing to timely retain an expert and forging a trial strategy without the benefit of knowing what their only expert pathologist would say regarding the lynchpin of their case. However, the state court ultimately

25

denied relief because it reasonably concluded Carter failed to demonstrate

prejudice in light of the record.  With regard to the instant allegations, trial

counsel for Carter, Richard Alley, explained in his affidavit:

* * *

Initially Santiago Salinas, my co-counsel undertook to find a pathologist to contradict the autopsy report of the Tarrant County Medical Examiner.  To locate a forensic pathologist is not an easy endeavor.  First, unlike the legal profession, there is a strong reluctance of any Doctor to comment adversely as to the work performed by another and this is apparently particularly true of pathologists.  There was an attempt to see if a Doctor from Colorado would take the role on an appointed case, but he informed Santiago (and Santiago informed me) that he was too busy to do so.  Later Santiago and I both made an attempt to contact and use as a defense expert, Dr. DiMaio from Bexar County but we were also unsuccessful in that attempt.  Santiago also contacted Doctor Linda Norton, from Dallas, and we were both told by her office that she required a retainer up-front of Five Thousand Dollars ($5,000.00) and there would be additional expenses and costs once she was retained with an indeterminate fee for her services both in preparation for testimony as well as in-court time as a defense expert witness.  I discussed her appointment and fee arrangement with Judge James Wilson who informed me that there was no way he would authorize such an up front payment or such an open-ended and unlimited fee arrangement to secure her services in the case for the defense.

A short time later, I called the Harris and Bexar County Medical Examiner's offices for consultation and was rebuffed by them although they did provide with the name of Dr. Charles Harvey, who was a former member of the Tarrant County Medical Examiner's office, as a possible expert witness for the defense. After several attempts Dr. Harvey was finally located, contacted and he agreed to assist.  I made the arrangements for him to review all documents, pictures, etc. with the assistance of my law student intern Patrick Garner and one of our two appointed investigators,

26

Bruce Cummings.  Dr. Harvey initially stated that if he could assist the defense, he would be only three and one-half hours away, since he was in the Woodlands, Texas, which is north of Houston on Interstate I-45.  After receiving all of the pertinent files and photos by overnite [sic] courier delivery Patrick Garner, myself and Bruce Cummings, communicated with Dr. Harvey.  Dr. Harvey first informed Bruce Cummings of his determinations and that he did not believe he could help the defense in challenging the Medical Examiner's autopsy finding.  Bruce told Santiago and I of this oral report and I then called Dr. Harvey in an effort to get a more detailed report.  Dr. Harvey told me that he could not help us in contradicting the cause and manner of death as set out by the Tarrant County Medical Examiner in its autopsy report, because he agreed with their findings, and that he would forward us a formal written report as soon as possible but that it would take some time to prepare which verified the substance of what Bruce Cummings had told us in his phone call with Dr Harvey.  I thanked Dr. Harvey for his oral report and informed the Defendant and all of the other members of the defense team of Dr. Harvey's oral report that he made to me in our long distance telephone conference.

It was decided at the time among all of the members of the defense team, and I believe that even today, that to put Dr. Harvey on and allow the State to cross examine him, would enforce the "suffocation"or "smothering" aspect, in addition to "strangulation," which Dr. Harvey would now include as a possible cause of death, i.e., manual strangulation and his testimony as reported to me would have reinforced the State's theory of prosecution and not aided the defense in its presentation on that issue.

The tactical decision was to argue the points conceded by Dr. Peerwani from his cross examination, and argue the "positions asphyxia" (hog-tying) cause of death.  Any expert would have to say without any reservation, that the only cause of death was "positional asphyxia," and we did not have such an expert.

It is my opinion that if we had put on Dr. Harvey, we would still be answering this same Writ on being ineffective for putting such an expert as Dr. Harvey on the stand.

27

* * *

SHCR 25-26 (emphasis in original).

Santiago Salinas, Carter's second chair trial counsel, echoed Alley's recollections in his affadavit:

> To locate forensic pathologist is not an easy endeavor. There was an attempt to see if a Doctor from Colorado would take the role on an appointed case, and he was too busy to do so. (Dr. Robert Bux, Colorado Springs, Colorado.) An attempt to use Dr. Vince DiMaio from Bexar County was also unsuccessful, but I do not recall the particulars. There was a Dr. Linda Norton from Dallas, and we were told by her office that she required a retainer up-front of Five Thousand Dollars ($5,000.00) before she would look an any document. To the best of my recollection this was discussed with Judge James Wilson and we were rebuffed in attempting to obtain those funds from the county, "up-front."

> Dr. Charles Harvey was finally located and he agreed to assist. Attorney Richard Alley made the arrangements for him to review all documents, pictures, etc. My recollection was that if he could assist the defense, he would be only three and one-half hours away, since he was in The Woodlands, Texas, which is north of Houston on Interstate I-45. Based on my review of my notes of my file, Mr. Bruce Cummings, one of two investigators assisting the defense, communicated to me that he had spoken with Dr. Harvey, and that Dr. Harvey had said that he could not help us. That he was in agreement with the findings of Dr. Peerwani.

> It was decided at the time, and even today, that to put Dr. Harvey on and allow the State to cross examine him, would enforce the "suffocation" or "smothering" aspect, in addition to "strangulation," which Dr. Harvey would now include as another possible cause of death, i.e., manual strangulation.

> The tactical decision was to argue the points conceded on the cross examination of Dr. Peerwani, and argue the "positional asphyxia" (hog-tying) cause of death. Any expert would have to say without any reservations, that the only cause of death was

positional asphyxia," and we did not have such an expert.

It is my opinion that if we had put on Dr. Harvey, we would still be answering this same Writ on being ineffective for **putting** Dr. Harvey on the stand.

SHCR 12-13 (emphasis in original).

During the state habeas hearing Dr. Harvey testified extensively on this issue. He told the court that he was trained by Dr. Peerwani and held him in great reverence. 1 SHRR[4] 23-24. He further testified, "I don't really have anything that I could differ with [Dr. Peerwani] in terms of the autopsy, the documentation of the autopsy, or the conclusions that were reached from that autopsy." *Id.* at 24. Regarding Carter's assertion that Harvey's report supports the defense theory that Tomlin might have been left in an uncompromised position, Harvey testified in part at the state habeas hearing when examined by the State:

* * *

Q. Okay. Had you been called to testify at Mr. Carter's trial, would you, as a forensic pathologist, have been able to render an opinion that Mr. Tomlin's death resulted from natural causes unrelated to being bound and smothered in the course of a n ongoing felony?

A. I don't think I would have.

Q. Had you been called to testify at Mr. Carter's trial, would you

---

[4]     "SHRR" refers to the Reporter's Record of transcribed state habeas proceedings.

have been able to render an opinion based on natural causes that would have contradicted Mr. - - Dr. Peerwani's conclusions in his autopsy report regarding the cause and manner of Mr. Tomlin's death?

A.  Only to the extent that the degenerative changes that were present in the heart and lungs and kidney made it easier to die.

Q.  Okay.  I'm going to move on tho another part of your report; although, it's still at page two of your forensic pathology consultation report.  You stated that it's possible that Mr. Tomlin was left in an uncompromised position and then struggled to free himself, rolled onto his stomach and face, and was further unable to extricate himself from this position; is that correct?

A.  That's what it says.

Q.  Okay.  Is there any medical evidence to your knowledge to support a conclusion that Mr. Tomlin rolled himself into that position?

A.  I can't do that with the autopsy, no.

Q.  So any - - any statements about whether Mr. Tomlin would have been able to roll himself into a position facedown or whether he was left in that position would be speculative?

A.  Yeah, we can't tell that.

* * *

2 SHRR 57-58.  The trial court questioned Dr. Harvey for clarification:

Q.  And you have suggested in your report and in your testimony today that positional asphyxiation could have been -- could have come about several different ways based on the lack of evidence at the crime scene; is that correct?

A.  Yes.  The only thing, I think, we really have that we know for certain is that he was found facedown on the floor in a prone

30

position.  How he arrived at that position - -

Q.  And that was - - that was what - - that along with the smothering were the two factors that caused his death?

A.  Yes, Ma'am, I think so.

Q.  And you think that the degenerative changes made him more vulnerable to those things causing his death.

A.  Yes.

Q.  Would that be fair to say?

A.  Now,  somewhere along the line, there's enough force applied to the front part of his face to produce the injuries that we saw in the pictures to the lips.  So there is that aspect of it, which I really tend to think is volition.

Q.  Tell - - tell -- explain that.  Can you expound on that please?

A.  Well, I don't think the weight of his head and shoulders alone lying down on the carpet like that could produce the degree of bruising that is present on the mucosal surface.

Q.  And what would be?  You had - - when the defense was questioning you, you said, yes, tight taping might be enough - - or forceful taping might be enough, and when the State was questioning you, then you said that there had to be something else applied to the tape.  So the Court's a little confused on that point.

A.  Well, that something else that's applied is the force of the hand over the mouth or - - whatever is there.  If he is lying face down in the towel and pressure is applied from the back of his neck, that can produce that kind of pressure that would produce these impressions that are there.

Q.  The impressions you're talking about inside the mouth?

A.  Inside the mouth, yes.

Q.  So it could be a pushing from the back; it could be a pushing from the front?

A.  Yes, it could be.

Q.  And in your opinion, as far as specific intent to kill, in what way would you believe that your testimony might have related to that? Do you have any opinion on that?

A.  That's a really tough question to answer, and I think I have to think about that quite a lot before I can come up with a real good answer.

Q.  Well, I - - what the Court wants to know and what we need to establish is how your testimony might have related to that.

A.  I would say that the report here - -

Q.  Your report raises a couple of issues in the view of the Court that casts some question on specific intent to kill regarding theses types of injuries and the cause of death.

A.  In regard to the possibility of natural causes being the - -

Q.  That's one.  And the other is whether the positional asphyxiation - - who caused it.

A.  Yes, who caused the positional asphyxia I - - I don't think that we have any way to define how that came about.  We've got - -

Q.  And I'm not talking about - -

A.  We've got three speculations.

Q.  I'm not talking about proving it, because obviously, you weren't there and you can't prove anything about exactly what happened. I'm talking about whether - - your ability to raise questions or possibilities.

A.  I do think that we have the - - the three speculative possibilities

of how he arrived into that position.  What I don't have is a good answer to the fact that there is smothering going on, and that looks like - -

Q.  Speak up, sir.

A.  There is smothering that's going on, and that's volitional.

2 SHRR 74-77.

Ultimately, the trial court concluded that counsels' performance was deficient because they did not conduct a prompt investigation despite knowing early on that intent would be the lynchpin of their case.  SHCR 144 (conclusions 14-16).  Nevertheless, the trial court recommended relief be denied on this claim because it concluded that Carter failed to demonstrate prejudice given the fact that neither expert could determine the exact cause of death, and each of the three possibilities proffered by Dr. Peerwani (and not contradicted by Dr. Harvey) involved suffocation, which is an intentional act sufficient to satisfy the offense as stated in the indictment.  SHCR 144-45 (conclusions 18-19).  After its own review of the record, the Court of Criminal Appeals adopted the following findings and conclusions made by the trial court with the exception of the second and third sentences of findings paragraph 24, and conclusions paragraph 8.

## Findings of Fact:

1.   Eighty-nine-year-old James Eldon Tomlin was found face-down on the floor of his house. His hands were bound at the wrists behind his back with multiple wrappings of duct tape in a "figure of eight" position; his feet were wrapped with duct

33

tape multiple times around the ankle area; and a small fragment of duct tape was found on his left cheek. (TR41: 151-54.)

2.      Tomlin had a significant injury on the inner surface of his upper lip caused by compression of his upper lip on his teeth while he was still alive. This is a "very classical and typical" injury when someone has been smothered. (TR41: 169-72.)

3.      Tomlin also suffered injuries to his head, face, and arm shortly before his death. (TR41: 151, 156-59, 161-65.) One blow to Tomlin's head was consistent with Tomlin being forcefully struck with the butt of a gun, which likely rendered Tomlin unconscious for five to ten minutes. (TR41: 159, 167.) Congestion and swelling in Tomlin's organs during autopsy were "stigmata or signs" that Tomlin died from some type of respiratory death. (TR 41: 174.)

4.      Dr. Nizam Peerwani, the Tarrant County Medical Examiner, ruled Tomlin's cause of death to be "smothering with positional asphyxia" and the manner of his death to be homicide. (TR41: 195.) Dr. Peerwani concluded that Tomlin died an asphyxial death at the hands of another human being, but he could not determine whether Tomlin ultimately died from smothering or from positional asphyxia. (TR41: 176, 179, 189, 191.)

5.      Dr. Peerwani proffered three scenarios: (1) he was intentionally smothered and then died; (2) he was intentionally smothered, left in a comprising position (positional asphyxia); and then died; or (3) he laid in a state of positional asphyxia, was subsequently smothered, and then died. (TR41: 215-16.)

6.      Applicant was arrested on September 22, 2004 for the capital murder and robbery of Tomlin. (WR3: 101.)

7.      Attorney Richard Alley was appointed on February 7, 2005 to represent Applicant. (WR3: 99.)

8.    Attorney Santiago Salinas was appointed on October 10, 2005
      as co-counsel to represent Applicant. (WR2: 97.)

9.    Alley and Salinas (collectively "counsel") admitted to knowing
      very early that Applicant's intent was the lynchpin of their
      defense strategy. (WR2: 99-100; WR3: 79.)

10.   On March 9, 2006, thirteen months after Alley was appointed,
      the defense filed a motion to hire a forensic pathologist. (WR2:
      97.)

11.   Jury selection began on August 24,2006. (WR2: 103-04.)

12.   Salinas talked to Dr. Guileyardo on September 6, 2006. [Live
      HearingRR2: 87, 108; 3: 35.] . Dr. Guileyardo was too busy to
      take Applicant's case and recommended Dr. Norton. [Live
      Hearing RR 2: 87,108.]

13.   Salinas contacted Dr. Norton's office on September 6, 2006,
      but she did not respond until September 20,2006. [Live
      Hearing RR 2: 86, 106; 3: 29.] Dr. Norton wanted three or four
      weeks to review the case and a $5,000 retainer up front. [Live
      Hearing RR 2: 86, 104.] Judge James Wilson told Alley that
      he would not authorize the up front payment or the open-
      ended contract Dr. Norton was going to ask for. [Live Hearing
      RR 2: 87, 105; 3: 30,35,73,121.] Alley then asked Dr. Norton
      to adjust her fee arrangement, but she would not do so. [Live
      Hearing RR 2: 31-32.]

14.   Salinas contacted Dr. Robert Bux on October 20,2006, after
      getting his name from Fort Worth attorney Bill Lane. [Live
      Hearing RR 2: 88, 109; 3: 35.] Dr. Bux was too busy to take
      the case and referred Salinas to Dr. Vince DiMaio out of San
      Antonio. [Live Hearing RR 2: 88, 112.]

15.   Alley contacted Dr. DiMaio on multiple occasions beginning
      on October 23,2006. [Live Hearing RR 2: 89; 3: 35-37, 111.]
      Dr. DiMaio was too busy to take Applicant's case and was
      reluctant to involve himself in the case in light of Dr.

Peerwani's involvement. [Live Hearing RR 3: 37.]

16.     At Dr. DiMaio's suggestion, Alley spoke to a pathologist at the Harris County Medical Examiner's Office. [Live Hearing RR 3: 37,111.] The pathologist was not interested in working for the defense. [*Id.*]

17.     Alley then got another pathologist's name from Dr. DiMaio. [Live Hearing RR 3: 37, 111.] Alley called the pathologist, but he either was unavailable or did not want to be involved in the case. [*Id.*]

18.     Alley spoke to Dr. Sridhar Natarajan, but he was unwilling to take Applicant's case. [Live Hearing RR 3: 112.]

19.     The defense first contacted forensic pathologist Dr. Charles Harvey on October 25, 2006. (WR2: 12-13.)

20.     The next day, the trial court signed an order appointing Dr. Harvey as a defense expert witness. (WR2: 99.)

21.     Four days later, on October 30, 2006, jury selection began and counsel sent Dr. Harvey the medical records for review. (WR2: 116.) Going to trial without an expert witness was a constant topic of conversation between Alley and Salinas. (WR2: 102.)

22.     On October 31, 2006, one day after testimony began, Dr. Harvey reviewed the medical records. (WR3: 89.) That same day, the defense received a message that Dr. Harvey agreed with Dr. Peerwani and that his findings did not substantially differ from Dr. Peerwani's. (WR2: 116-17; WR3: 44-46.)

23.     The next day, the jury found Applicant guilty of capital murder, and he was sentenced to death on November 15, 2006. (WR2: 116.)

24.     On November 27, 2006, Dr. Harvey prepared his written report and submitted it to the defense. (WR2: 10.) The report differed from the testimony elicited from Dr. Peerwani and from what counsel understood Dr. Harvey's findings to be in

36

only two respects. The report introduced the possibility of strangulation (as distinguished from suffocation) and mentioned the possibility that the victim's age was an aggravating factor. (WR2: 69, 74.). However, this report did not, and was not intended to, dispute or contradict Dr. Peerwani's autopsy findings because Dr. Harvey agreed that the cause of death was smothering with positional asphyxia. (WR2: 24, 30.)[5]

25.    The defense did not call Dr. Harvey to testify before the jury or the court at any stage of Applicant's trial. (WR2: 43.) Counsel admitted that, in hindsight, it would have been a good idea to move for a continuance and properly consult with Dr. Harvey before making the decision not to call him. (WR2: 117-18.)

26.    Had Dr. Harvey been called to testify at Applicant's trial, he would not have rendered an opinion based on natural causes that would have contradicted Dr. Peerwani's conclusions regarding the cause and manner of Tomlin's death. (WR2: 57-58.)

## Conclusions of Law:

1.    In determining whether an applicant received ineffective assistance of counsel, courts use the standard set forth in *Strickland* v. *Washington,* 466 U.S. 668 (1984), which was adopted by Texas in *Hernandez* v. *State,* 726 S. W.2d 53 (Tex. Crim. App. 1986).

2.    To show counsel was ineffective, Applicant must show that (1) counsel was deficient and (2) the deficiency prejudiced the defense. *Strickland,* 466 U.S. at 687 (1984). Applicant carries the burden to prove this by a preponderance of the evidence. *Thompson* v. *State,* 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

---

[5]    The Court of Criminal Appeals did not adopt the second and third sentences of this finding.

3.  To determine whether counsel's performance was deficient, the court applies an objective standard of reasonableness measured by professional norms. *Thompson, 9* S.W.3d at 812. As this standard is highly deferential, Applicant must overcome the presumption that the challenged action may be considered sound trial strategy. *Strickland,* 466 U.S. at 689.

4.  A determination of ineffectiveness cannot be supported by second-guessing counsel's trial strategy through hindsight or by finding that another attorney would have acted differently. *Blott* v. *State,* 588 S.W.2d 588, 592 (Tex. Crim. App. 1979).

5.  A claim of ineffective assistance for failure to present evidence is without merit absent a showing that a witness was available and that the appellant would have benefited from this testimony. *Wilkerson* v. *State,* 726 S.W.2d 542, 550-51 (Tex. Crim. App. 1986) (en banc).

6.  Counsel's decision not to call Dr. Harvey did not, by itself, constitute deficient performance within the meaning of *Strickland.* Instead, counsel made a reasonable, strategic decision not to call Dr. Harvey to testify at Applicant's trial after Dr. Harvey told the defense that he had reviewed everything, agreed with Dr. Peerwani, and could not help the defense. Counsel reasonably concluded that Dr. Harvey's testimony would have weakened the defense's accidental-positional-asphyxia theory by reinforcing the State's evidence of an intentional-smothering cause of death and by opening him up to cross-examination on this matter. (*See* WR2: 115-16, 125-26; WR3: 55-56.)

7.  Counsel made a reasonable, tactical determination that the best defense strategy available was to emphasize the points conceded by Dr. Peerwani during his cross examination regarding the positional-asphyxia aspects of the case in order to show that this was more likely an accidental death from positional asphyxia rather than an intentional act designed to kill Tomlin. *(See* WR3: 55-56.)

8.  In making strategic decisions regarding Applicant's defense,

Alley and Salinas could rely only on what they knew at the time, and their reasonable, strategic decisions must not be judged by hindsight or penalized for what counsel should have known. *See Blott,* 588 S.W.2d at 592.[6]

9.    Applicant's inability to prove that Dr. Harvey's testimony would have benefitted the defense prevents Applicant from overcoming the presumption that counsel acted in accordance with sound trial strategy, and thus, removes the decision from scrutiny for ineffectiveness.

10.   Even if counsel had secured Dr. Harvey early enough to discover the contents of his report before trial, they would not have called Dr. Harvey to testify because it would have been more harmful than beneficial to their case by introducing another intentional act (strangulation). (WR2: 96-97.)

11.   In addition to the duty to present evidence, counsel has the duty to make reasonable investigations or to make reasonable decisions that make such investigations unnecessary. *Strickland,* 466 U.S. at 688-89.

12.   This duty is measured by the prevailing norms of practice, which, as reflected in the ABA Standards for Criminal Justice, means "conduct[ing] a prompt investigation of the circumstances of the case and explor[ing] all avenues leading to facts relevant to the merits of the case." ABA Standards for Criminal Justice 4-4.1 (3d ed. 1996).

13.   When made after a thorough investigation of the relevant law and facts, counsel's strategic choices are virtually unchallengeable as ineffective assistance. *Strickland,* 466 U.S. at 690-91. When made after a less than complete investigation, in contrast, counsel's strategic choice to limit the investigation may be supported by reasonable professional judgment. *Strickland,* 466 U.S. at 690-91,699.

---

6      This conclusion was also not adopted by the Court of Criminal Appeals.

14. Counsel acted deficiently under the first prong of *Strickland* by failing to satisfy the duty to investigate because, viewing reasonableness in light of what counsel knew at the time, counsel did not conduct a prompt investigation. *See Strickland,* 466 U.S. at 688,690.

15. Despite knowing early that intent would be the lynchpin of their case, counsel waited several months to file a motion to hire an expert, waited until after jury selection began to contact their first potential expert pathologist, and waited until testimony began to send Dr. Harvey the records.

16. Based on the prevailing norms of practice, forging a trial strategy without the benefit of knowing what their only expert pathologist would say regarding the lynchpin of their case cannot be considered a decision supported by reasonable professional judgment.

17. To demonstrate prejudice (the second prong of *Strickland),* Applicant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland,* 668 U.S. at 694. The benchmark for judging a claim of ineffectiveness of counsel is whether counsel's conduct "so undermined the proper functions of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686.

18. Although neither expert could conclusively determine the exact cause of death, each of the three possibilities proffered by Dr. Peerwani (and not contradicted by Dr. Harvey) involved suffocation, which is an intentional act sufficient to satisfy the offense as stated in the indictment. (TR41: 215-16; CR 127.)

19. In light of these conclusions reached by both experts, the evidence included in Dr. Harvey's written report would not have benefitted the defense, so it would not have had a reasonable probability of changing the results of the proceedings. *See Strickland,* 668 U.S. at 694.

20. Despite counsel's deficiency for failure to investigate under the first prong, counsel's assistance was still effective under *Strickland* because Applicant has not established a reasonable probability that the trial cannot be relied on as having produced a just result. *See Strickland,* 466 U.S. at 686. Therefore, this Court recommends that Applicant's first and second claims for relief be denied.

SHCR 139-45 (citations in original) (footnotes added).

The record reflects that counsel formed the trial strategy to make intent the focus of their defense early on in the case. They considered retaining a pathologist and filed a motion for appointment of a pathologist seven months before testimony began. Counsel made numerous efforts to retain a forensic pathologist before they secured Dr. Harvey. Defense counsel rebutted the State's theory with cross-examination of Dr. Peerwani which the Supreme Court has held may suffice. *See Richter*, 131 S. Ct. at 791 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation."). They made a strategic decision to emphasize the points that Dr. Peerwani conceded during cross-examination and undermine the State's theory by focusing on Dr. Peerwani's uncertainty whether Tomlin ultimately died from being smothered or from positional asphyxia.

Even if counsels' performance were deficient, the state court's conclusion that Carter failed to demonstrate prejudice is not unreasonable. Counsel were able to elicit testimony from Dr. Peerwani that positional asphyxia could have

been the terminal event, even if Tomlin had also been smothered.  41 RR 197-217, 208-10, 216-17  And during closing argument they used cross-examination testimony of Dr. Peerwani to put forth the theory that Tomlin died from positional asphyxia after Carter had left the house. 42 RR 47-66; 41 RR 208-210, 216-17. *Richter,* 131 S.Ct. at 792 (no prejudice where defense counsel "extracted a concession" from the expert undermining the expert's opinion).  Carter's focus on Dr. Harvey's report and testimony that Tomlin might have been left in an uncompromised position and rolled over onto his stomach while struggling to free himself is by Dr. Harvey's own admission, speculative.  2 SHRR 58.  Any advantage gained by Carter on this point would have been outweighed by the harm of subjecting Dr. Harvey to cross-examination by the State.  Dr. Harvey's state habeas testimony explains how smothering and positional asphyxia may have simultaneously occurred and indicates he ultimately agrees with Dr. Peerwani's findings.  2 SHRR 24, 28-32, 48.  Consistent with Dr. Peerwani's testimony, Dr. Harvey testified that "smothering usually requires a lot of external force.  And in this case smothering produced a pattern of impressions on the inside of the mucosal surface of the mouth and the lips that is the indication at autopsy that there was a smothering even that occurred." 2 SHRR 25.  Also, Dr. Harvey did not dispute Dr. Peerwani's findings that Tomlin was smothered, and further rejected the theory that the smothering was due to the

placement of duct tape over Tomlin's mouth. 2 SHRR 49-50. When asked by the

State if that single strip of duct tape over Mr. Tomlin's mouth caused smothering

or caused Tomlin's death, Dr. Harvey responded, "[t]hat piece of duct tape is

fairly short. I think we're trying to stretch it if we're trying to say that that

particular piece of duct tape is the occluding mask." *Id.* at 50. He elaborated:

> Q. Do the photographs that you have in front of you - - do those
> show the inner markings of the mucosa, the lacerations to Mr.
> Tomlin's inner lip?
>
> A. I can see some abrasion and contusions that are present. I don't
> know that I see a laceration these pictures right here.
>
> Q. Is that type of injury consistent with being smothered?
>
> A. It is very much so.
>
> Q. Would you agree that those were a classic type of injury that you
> see in a case where someone has been smothered either by applying
> pressure with a palm to the mouth or possibly pushing the face
> against a hard surface like a floor?
>
> A. Yes.
>
> Q. Would those types of injures likely be caused by one strip of duct
> tape placed across the mouth, if the duct tape had been placed
> across Mr. Tomlin's mouth?
>
> A. If the duct tape were placed in a forceful manner, the way that
> you would occlude with the hand so that you're using the duct tape
> as an additional occluding device, yes, you could produce this.
>
> Q. But that would be the duct tape as an additional occluding
> device, possibly, also, with the hand or pushing? Is that what - - I'm
> sorry.

A.  The injury that is present here is something that is produced from a degree of trauma that is applied.

Q.  Okay.

A.  That usually is a hand pushing against the mouth and the lips.

2 SHRR 53 - 53.  When asked by the State if he intended in his report to dispute any part of Dr. Peerwani's conclusion that the cause of Mr. Tomlin's death was smothering with positional asphyxiation, he responded, "I did not." 2 SHRR 65.

Additionally, Dr. Harvey's evidentiary hearing testimony presented the remote possibility that Tomlin was strangled, based on a hemorrhage to the neck.  2 SHRR 61- 64.  While Dr. Harvey, testified that strangulation was not supported by the presence of fractures, 2 SHRR 61, he also testified that the hemorrhage suggests the possibility of blunt force trauma, or a blow to that area.  *Id.* at 62.   Dr. Harvey testified that even in the absence of damage to the underlying structures, strangulation remains a remote possibility.  *Id.* at 69.  Although the Court of Criminal Appeals declined to adopt two sentences of the trial court's finding number 24—which stated, the report differed from the testimony elicited from Dr. Peerwani and from what counsel understood Dr. Harvey's findings to be in only two respects, and also stated, the report introduced the possibility of strangulation (as distinguished from suffocation) and mentioned the possibility that the victim's age was an aggravating factor—nevertheless, had Dr. Harvey testified at trial, a remote possibility of

strangulation would have been presented as well as evidence of at least a blow to the neck of Tomlin. In all, Dr. Harvey's testimony would not have contributed anything helpful to Carter beyond Dr. Peerwani's testimony conceding a possibility of death by positional asphyxiation, 41 RR 197-210. In fact, Dr. Harvey's testimony would have supported Dr. Peerwani's testimony regarding smothering with positional asphyxiation. Also, Dr. Harvey's testimony would have presented evidence of additional violence suffered by Tomlin.

Furthermore, the jury heard other compelling evidence that demonstrated Carter's intent to cause Tomlin's death. Carter went to Tomlin's house with Allen, who Tomlin knew, and neither Allen or Carter made an attempt to hide their identities. Carter brought a gun to Tomlin's house and struck Tomlin on the head with enough force to split Tomlin's skin and render him unconscious temporarily. Carter also suffered other injuries (contusions to his face and arm) as a result of Carter's violence toward Tomlin during the offense. Carter bound Tomlin's hands and feet behind him with duct tape, and Tomlin had an injury to his inner lower lip which indicated that he was smothered for at least thirty seconds either by someone placing a hand over his mouth or pressing his face into the floor with sufficient pressure to cut off the airway to his lungs. In light of all of the evidence, there is no reasonable probability of a different result; thus the state court's denial of relief was not objectively unreasonable.

45

For all of the foregoing reasons, Carter has failed to rebut the state court findings with clear and convincing evidence, nor has he proven that the state court conclusions are unreasonable in light of the evidence. Consequently, because the state court's ultimate rejection of this claim is not contrary to and does not involve an unreasonable application of clearly established federal law, Carter is not entitled to relief on this claim.

## II.   Carter's Claim that the Lack of a Burden of Proof on the Special Issues Is Unconstitutional Is *Teague*-barred and Without Merit. Moreover, the State Court's Resolution of this Claim Is Not Unreasonable.

Carter claims that he was unconstitutionally sentenced to death because the mitigation special issue fails to allocate a burden of proof requiring the State to prove beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant that a sentence of life imprisonment be imposed. Brief at 20-32. However, as explained below, Carter's argument is *Teague*-barred and without merit.

### A.   Applicable capital-sentencing scheme

Carter was tried and convicted under a provision of Texas law that makes it a capital felony to intentionally murder an individual in the course of committing or attempting to commit robbery, kidnaping, or aggravated sexual assault. 1 CR 2; *See* Tex. Penal Code § 19.03(a)(2). At the conclusion of the guilt-innocence phase of trial, the court instructed the jury that it was required

46

to find each element of the offense beyond a reasonable doubt before it could return a guilty verdict.   11 CR 2597, 2605; *see also* Tex. Penal Code § 2.01. Pursuant to these instructions, the jury convicted Carter of capital murder.   11 CR 2607, 2632-34.

Subsequently, a separate punishment hearing was conducted to determine the appropriate sentence.   Following the presentation of punishment evidence, the jury was asked to respond to the following special issue:

> SPECIAL ISSUE NUMBER ONE: Do you find by a preponderance of the evidence that the Defendant, Tilon Lashon Carter, is a person with mental retardation?

11 CR 2612.   The Court instructed the jury that it "may not answer Special Issue Number One "Yes" or "No" "unless you agree unanimously." *Id.*   The Court further instructed the jury, "[i]f your answer to Special Issue Number One is "No," then you will answer Special Issue Number Two and Special Issue Number Three; otherwise, you will not answer Special Issue Number Two and Special Issue Number Three." *Id.*   The jury answered the first special issue in the negative and proceeded to the following two special issues.

> SPECIAL ISSUE NUMBER TWO: Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

47

> SPECIAL ISSUE NUMBER THREE: Do you find from the evidence beyond a reasonable doubt that the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?

11 CR 2612-613.  After responding affirmatively to both the second and third special issues, the jury proceeded as instructed to answer special issue four:

> SPECIAL ISSUE NUMBER FOUR: Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

11 CR 2613-614, 2617-619; *see also* Tex. Code Crim. Proc. art. 37.071 § 2(e).  In responding to this issue, jurors were told that they could not answer "no" unless they unanimously agreed, and could only answer "yes" if ten or more jurors were in agreement to do so.  11 CR 2613-14; *see also* Tex. Code Crim. Proc. art. 37.071 § 2(f)(2).  Jurors were also charged that they "need not agree on what particular evidence supports an affirmative finding on the issue."  11 CR 2614; Tex. Code Crim. Proc. art. 37.071 § 2(f)(3).  If Carter's jury had failed to reach a unanimous decision regarding this issue, the trial court was required to sentence him to life imprisonment.  *See* Tex. Code Crim. Proc. art. 37.071 § 2(g).

**B.   Nothing announced in *Apprendi and Ring* or their progeny mandates that the Texas mitigation special issue be proven by the State beyond a reasonable doubt.**

48

Carter argues that the Supreme Court's sentencing jurisprudence—including *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and their progeny—now mandate a change in Texas law and practice. On direct appeal, the Court of Criminal Appeals denied this claim as barred by precedent. *Carter v. State*, slip op. at 10. Carter subsequently, raised the claim on state habeas and the state court denied it as raised and rejected on direct appeal. SHCR 152. Carter cannot demonstrate that the state court's resolution of this claim is unreasonable. Habeas relief must be denied.

The absence of sufficient mitigating circumstances is not an element of capital murder and is not an aggravating fact that increases the penalty for capital murder. Rather, the presence of sufficient mitigating circumstances is plainly a mitigating fact which allows a defendant to escape the maximum penalty for capital murder. As a result, the Fifth and Sixth Amendment rationales the Supreme Court has applied in other cases are inapposite to Carter's case, as the Fifth Circuit has repeatedly held. See *Blue v. Thaler,* 665 F.3d 647, 669 (5th Cir. 2011)*; Druery v. Thaler,* 647 F.3d 535, 546-47 (5th Cir. 2011); *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006) ("[A] finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death.").

Neither *Ring* nor *Apprendi* contemplate the application of the Sixth Amendment's "reasonable doubt" requirement to a capital sentencing jury's findings regarding mitigating factors. In *Apprendi*, the Supreme Court reversed a non-capital conviction because the trial court unconstitutionally increased the defendant's sentence beyond the statutory maximum based upon a separate—but unindicted—hate-crime statute. 530 U.S. at 470-71. The underlying indicted offense carried only a maximum penalty of ten years incarceration, while the unindicted hate-crime offense was punishable by an extended term of imprisonment, between ten and twenty years, "if the trial judge [found], by a preponderance of the evidence, that the defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race[.]" *Id.* at 468-69 (internal quotations omitted). Apprendi was sentenced to twelve years. *Id.* at 471. The Court reasoned that the New Jersey provision at issue violated "basic principles" mandating that a jury try all facts necessary to constitute a statutory offense and that these facts be proven beyond a reasonable doubt. *Id.* at 483-84. Consequently, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. Because the New Jersey hate-crime statute required (1) the trial judge to resolve (2) the

fact question of the defendant's state of mind or criminal motive, and (3) the burden of proof was a preponderance of the evidence, the statute was declared unconstitutional. *Id.* at 491-93.

But the *Apprendi* decision is of no moment here.  In Carter's case, each of the elements of capital murder were indicted, submitted to the jury, and proven beyond a reasonable doubt as a prerequisite to reaching the punishment phase of his trial.  Carter was certainly on notice of each of these elements, which are set forth in the Texas capital murder statute and were tracked in the indictment as well as the guilt-innocence jury charge.  Compare Tex. Penal Code §§ 19.02(b)(1), 19.03(a)(2) with 11 CR 2597–2606.  Further, Carter was aware that the prescribed maximum penalty for capital murder is death.  Tex. Penal Code §§ 12.31(a), 19.03(b).  Finally, once Carter's trial proceeded to the punishment stage, the future dangerousness special issue was submitted to the jury according to Texas law, and the jury was instructed that the State must prove it beyond a reasonable doubt.  Tex. Code Crim. Proc. art. 37.071 § 2(b)(1); 11 CR 2611-2616.  Thus, Texas law did not improperly attempt to bypass *Apprendi's* Sixth Amendment rationale in determining Carter's guilt or his "death eligibility."

In *Ring*, the Court applied its rationale in *Apprendi* to Arizona's capital-sentencing scheme.  536 U.S. 588-89.  Ring was convicted by a jury of the lesser-

included offense of felony murder because the evidence tied him to the proceeds of an armored car robbery, but not the actual murder of the driver. *Id.* at 591-92. Under Arizona law, Ring was not eligible for the death penalty, the statutory maximum for first-degree murder, unless further findings were made by the judge. *Id.* at 592. During the sentencing proceeding, new evidence led the trial court to conclude that Ring murdered the armored car driver, and the court sentenced him to death. *Id.* at 593-594. The Court noted that, "[b]ased solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* at 596. The Court further explained that, where an increase in punishment is contingent on an additional finding of fact, the Constitution requires that fact to be found by a jury beyond a reasonable doubt. *Id.* at 602. Thus, to the extent that Arizona's sentencing scheme "[allowed] a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty," it was held unconstitutional. *Id.* at 609.

Carter maintains that the Texas death-penalty statute is inconsistent with the Fifth and Sixth Amendment principles announced in *Apprendi, Ring,* and their progeny because the State is not required to prove the mitigation issue beyond a reasonable doubt. Carter argues "[a]pplying the constitutional

definition of 'statutory maximum' as explicated in *Ring* and *Blakely*[7] to the Texas capital punishment scheme, the highest punishment the trial court can possibly impose without the additional findings required by Subsection (e) is a life sentence." Brief at 23. (citing *Ring*, 536 U.S. at 610).

Contrary to Carter's assertion, *Apprendi, Ring,* and their progeny are inapposite here because the Texas mitigation special issue does not operate as the "functional equivalent of an element of a greater offense." *Ring*, 536 U.S. at 609; *Apprendi*, 530 U.S. at 494. Carter improperly attempts to construe the mitigation special issue as an aggravating factor by suggesting that the *absence* of sufficient mitigation evidence functionally aggravates his sentence from life to death. Although he is correct that a Texas capital-sentencing jury must specifically answer the disputed issue in the negative to render a death sentence, the special issue is plainly meant to inure to the defendant's benefit by allowing the jury an avenue to give effect to mitigating evidence.

Capital punishment jurisprudence has traditionally recognized the distinction between aggravating factors and mitigating circumstances. In *Tuilaepa v. California*, this Court explained that there are "two different aspects of the capital decision making process: the eligibility decision and the selection decision." 512 U.S. 967, 971 (1994). To determine that an individual is eligible

---

[7]        542 U.S. 296 (2004).

for the death penalty, the jury must convict the defendant of murder and find one "aggravating circumstance" at either the guilt or punishment phase of trial. *Id.* at 972. "The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)," and may not be a factor applicable to every defendant convicted of murder. *Id.* The selection decision, however, serves an entirely different function. Here, the jury decides whether a defendant who is eligible for the death penalty should, in fact, receive that sentence. *Id.* "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstance of the crime." *Id.* (citing *Zant v. Stephens*, 461 U.S. 862, 879 (1983)) (emphasis in original).

Under Texas law, the mitigation special issue is not an element of the offense of capital murder, nor is it an aggravating circumstance as defined by *Tuilaepa.* Rather, it is the vehicle through which the jury is given the opportunity to make an individualized determination of the offender's moral culpability, as required by the Eighth Amendment. *Penry v. Johnson*, 532 U.S. 782, 797 (2001); *Eddings v. Oklahoma*, 455 U.S. 104, 111-12 (1982); *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976). The Supreme Court has explained that such a determination need not be structured in any particular way, as long as the jury is allowed to judge for itself what is mitigating and in what way.

*Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988) (plurality op.).  In making the decision, the jury is instructed to consider all the evidence, including the circumstances of the offense, the defendant's character and background, and general moral culpability of the defendant.   Tex. Code Crim. Proc. art. 37.071 § 2(e) & (f).  The jury is not required to agree on what evidence supports an affirmative answer. Tex. Code Crim. Proc. art. 37.071 § 2(e) & (f).  Clearly, the mitigation issue confers upon the jury a broad ability to show leniency and *reduce* the defendant's sentence to life imprisonment.  As the Fifth Circuit recently recognized "a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death." *Granados*, 455 F.3d at 537.  Thus, it is untenable that this special issue is functionally equivalent to an aggravating factor.

Moreover, the distinction between aggravating factors and mitigating circumstances is expressly acknowledged in both the *Apprendi* and *Ring* decisions.  In *Ring*, the Court emphasized that the defendant's claim was "tightly delineated" to the issue of whether the Sixth Amendment requires a jury finding on the aggravating circumstances asserted against him, and made no assertions with respect to mitigating circumstances.  536 U.S. at 597 n. 4.  The Court's ultimate conclusion was limited accordingly.  *Id.* at 609 (holding that *Walton v. Arizona*, 497 U.S. 639 (1990), was overruled to the extent that it "allows a

sentencing judge, sitting without a jury to find an *aggravating* circumstance necessary for the imposition of the death penalty," and that "[b]ecause Arizona's enumerated *aggravating factors* operate as the functional equivalent of an elements of a greater offense, the Sixth Amendment required that they be found by a jury") (internal citations and quotations omitted).

Likewise, the *Apprendi* decision explicitly noted and reaffirmed the distinction between "facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 U.S. at 490 n. 16.  There, the Court noted that where a judge finds a fact which allows a defendant to "escape the statutory maximum" attached to a jury verdict, that finding by a judge "neither expos[es] the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the verdict alone." *Id.*   Similarly, in a concurring opinion joined by Justice Scalia, Justice Thomas pointed out that facts with the potential to mitigate punishment are not an element of a crime that might increase a sentencing decision.  *Id.* at 501(Thomas, J. concurring, joined by Scalia, J.). Clearly, neither the *Ring* nor *Apprendi* holdings contemplate extending the Sixth Amendment's "reasonable doubt requirement" to a capital jury's finding regarding mitigating evidence.

Equally important here is the portion of *Walton* left untouched by the

56

majority in *Ring*, wherein the Court stated that the Eighth Amendment did not bar a state from imposing a burden of proof *on the defendant* to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 649-51. The Court noted that nothing in its Eighth Amendment jurisprudence precluded the state from "specifying how mitigating circumstances are to be proved." *Id.* at 649. Indeed, it noted that in several other capital cases, it found it constitutional for a state to impose a burden of proof on the defendant to prove issues such as self-defense, insanity, and "the affirmative defense of extreme emotional disturbance." *Id.* at 650 (citations omitted). The Court gleaned from these cases the following rule:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden to prove mitigating circumstances sufficiently substantial to call for leniency.

*Id.*

Additionally, the practical implications of Carter's argument preclude the adoption of his reading of *Apprendi* and *Ring*. Prosecutors would be in the absurd position of proving a negative beyond a reasonable doubt. This is impossible under the Texas system in which jurors are left to decide what evidence is mitigating and whether that evidence suggests that mercy is

appropriate, and where individual jurors need not agree on what evidence is mitigating when voting on this issue.  Thus, not only would accepting Carter's assertion improperly extend *Apprendi* and *Ring* without basis and pervert much of Supreme Court and Eighth Amendment jurisprudence, it would also be highly impractical.  Federal habeas relief on this claim must be denied.  "No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d. 370, 378 (5th Cir. 2005); *see also Avila v. Quarterman,* 560 F.3d 299, 315 (5th Cir. 2009); *Ortiz v. Quarterman*, 504 F.3d 492, 504-505 (5th Cir. 2007); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007).

Carter's reliance on *Cunningham* is equally unpersuasive.  Brief at 26-27.  As summarized in *Cunningham,* "the Federal Constitution's jury-trial guarantee" requires that a jury, rather than a judge, determine beyond a reasonable doubt whether *aggravating* factors exist in a particular criminal case that increase a defendant's punishment beyond the statutory range authorized by the jury's verdict.[8]  The mitigation special issue is neither an element of capital murder nor

---

[8]    127 S. Ct. at 860 (citing *United States v. Booker,* 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004); *Ring*, 536 U.S. 584; *and Apprendi,* 530 U.S. 466); *see also id.* at 871 (holding that California's determinate sentencing law violates the Sixth Amendment because it "authorizes the judge, not the jury, to find the facts permitting an upper term sentence"); *Booker*, 543 U.S. at 244 (stressing that it is the jury, not the judge, who must find facts that support the infliction of a punishment that is beyond the statutory maximum for any given crime); *Blakely*, 542 U.S. at 303 (reiterating that judges are not to inflict punishments above the statutory

an aggravating circumstance, however. *Tuilaepa,* 512 U.S. at 972.  And Carter was not sentenced beyond the statutory maximum for capital murder in Texas, where the death penalty is the ultimate punishment allowed under the Texas death-penalty statute.  The Texas statute does not allow for any enhancements beyond the statutory maximum penalty of death.  Rather, under the Texas statute, a jury finding on the special issue of mitigation can serve only to reduce the statutory sentence to life imprisonment.  Thus, no *Apprendi/Ring* issue is present.  The core principles of due process, fair notice, and right to a jury that the Supreme Court recognized in *Ring* and *Apprendi* are simply not implicated here.  Accordingly, the  state court's resolution of this claim is reasonable, and relief should be denied.

In addition, because there is no rule of constitutional law supporting Carter's claim, including *Apprendi, Ring*, and their progeny, his allegation is *Teague*-barred.  As explained in detail *infra,* the Sixth Amendment rule of *Ring* and *Apprendi* does not apply in the instant context.  Thus, any expansion of *Ring* or *Apprendi* to encompass mitigating factors *would* violate *Teague,* because it

---

maximum penalty unless either the defendant admits to the factors justifying an increase in punishment or the jury first enters fact findings to support the heavier punishment); *Ring*, 536 U.S. at 609 (holding that the determination as to whether sufficient aggravating circumstance exist in a particular case to justify a death sentence must be made by a jury rather than by a judge); *Apprendi*, 530 U.S. at 490 (holding that punishment-enhancing facts must be submitted to a jury and proved beyond a reasonable doubt.).

would require a new rule of law. *Teague v. Lane*, 489 U.S. at 10 ("new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced"); *Rowell v. Dretke*, 398 F.3d at 377-78 (5th Cir. 2005). Under *Teague*, new rules of constitutional criminal procedure will not be announced on federal habeas review and then retroactively applied unless an exception applies. *Id.* The first exception to *Teague's* retroactivity limitation is for rules that would place primary conduct beyond the government's power to proscribe or prohibit a certain category of punishment for a class of defendants based on their status or offense. *See Graham v. Collins*, 506 U.S. 461, 477 (1993) (citations omitted). The second *Teague* exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial. *Id.* at 478. The issues in *Apprendi* and *Ring* and the instant case are dissimilar, as shown above. *See Texas v. Cobb*, 532 U.S. 162, 169 (2001) ("Constitutional rights are not defined by inferences from opinions which did not address the question at issue."). For these reasons, Carter is not entitled to habeas relief on this claim.

## III.   Carter Cannot Demonstrate that the State Court's Resolution of His "10-12" Rule Claim Is Unreasonable. Moreover, this Claim Is *Teague* barred.

Carter next alleges that the trial court's punishment charge denied him due process and violated the Eighth Amendment's prohibition against cruel and

unusual punishment because it did not inform the jury that Carter would automatically receive a life sentence if the jurors did not reach a unanimous verdict on one or more of the special issues. Brief at 32-38. Specifically, he claims that the purpose of Texas's 10-12 rule is to "mislead the jury about the consequence of its failure to reach a verdict." Brief at 32. Carter further complains that application of Texas's "10-12 rule" has "a coercive effect on jury deliberations and discourages each juror from expressing an individual judgment about which circumstances, if any, warrant a sentence of life imprisonment rather that death, it seriously compromised the reliability of the sentencing decision in Tilon Carter's capital murder prosecution." Brief at 38. The Court of Criminal Appeals, on both direct review and state habeas, denied this claim as foreclosed by precedent. *Carter v. State,* slip op. at 9; SHCR 149. The state court's resolution of this claim is reasonable, and habeas relief must be denied on this *Teague*-barred claim.

As support for his claim, Carter relies on the Supreme Court's holdings in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and *Mills v. Maryland*, 486 U.S. 367 (1988). *Id.* These claims, however, lack merit; they are also *Teague*-barred and foreclosed by both Fifth Circuit and Supreme Court precedent.

Initially, Carter's reliance on *Caldwell* is misplaced. In *Caldwell*, during the punishment phase's closing argument, the prosecutor "urged the jury not to

view itself as determining whether the defendant would live or die" because the Mississippi Supreme Court would review any death sentence the jury might return. 472 U.S. at 323. The narrow issue before the Supreme Court was thus "whether a capital sentence is valid when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." The Court concluded that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence lies elsewhere." *Id.* at 328-29. The Texas instruction in no way misleads the jury into believing someone else is responsible for determining sentence, and the instructions do not misstate the jury's role. *See Druery v. Thaler*, 647 F.3d at 544 (rejecting same arguments) (citing *Dugger v. Adams*, 489 U.S. 401, 407-08 (1989) (to establish *Caldwell* violation, defendant must show that remarks to jury improperly described role assigned to jury by local law)).

Moreover, in an analogous case, the Supreme Court rejected the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation, *Jones v. United States*, 527 U.S. 373, 381 (1999); Carter's attempt to distinguish *Jones* falls far short of the mark. See Brief at 33. In *Jones*, the capital defendant wished to inform the jury that the

trial judge would impose a life sentence without parole if the jury could not reach a punishment verdict. 527 U.S. at 380-381. The Court noted that such issues do not involve the failure to provide the jury with mitigating evidence, but only whether the jury was misled regarding its role in the sentencing process. *Id.* at 381-382. In rejecting Jones's contention, the Court held:

> The truth of the matter is that the proposed instruction has no bearing on the jury's role in the sentencing process. Rather, it speaks to what happens in the event that the jury is unable to fulfill its role . . . . Petitioner's argument . . . appears to be that a death sentence is arbitrary within the meaning of the Eighth Amendment if the jury is not given any bit of information that might possibly influence an individual juror's voting behavior. That contention has no merit.

*Id.* at 382. And as the Court emphasized, "we have long been of the view that '[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves,'" and "the Government has 'a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.'" *Id.* (citations omitted).

The *Jones* Court further cited with approval a Virginia Supreme Court decision in which that court upheld the trial court's refusal to give an instruction offered by the defendant which would have told the jury that the court would impose a life sentence if the jury could not reach agreement. The Virginia court stated that "while this was a correct statement of law, it concerned a procedural matter and was not one which should have been the subject of an instruction. It

63

would have been an open invitation for the jury to avoid its responsibility and to disagree." *Justus v. Virginia*, 266 S.E.2d 87, 92-93 (Va. 1980).  In citing *Justus* with approval, the Supreme Court reiterated its long-held view that the government has a strong interest in its juries both reaching a verdict and expressing the community conscience on the ultimate question of life or death. *Jones*, 527 U.S. at 382.

While noting that a jury cannot be affirmatively misled regarding its role in the sentencing process, *see Romano v. Oklahoma*, 512 U.S. 1, 9 (1994), the *Jones* Court specifically rejected the contention that the refusal to give the proposed instruction had this effect.  Instead, the Court found that the proposed instruction had no bearing on the jury's role in the sentencing process, because it concerned only the situation in which a jury is unable to fulfill its role.  527 U.S. at 382.  Recognizing that a capital jury has never been entitled to all information that might possibly influence an individual juror's voting behavior, the Court reiterated that the Eighth Amendment does not require that a jury be instructed as to the consequences of its failure to reach a verdict.  *Id.* at 382. Therefore, Supreme Court precedent compels rejection of Carter's claim as a matter of law.

Moreover, extending *Caldwell's* holding beyond the narrow facts of that case—constitutionally impermissible comments made by the prosecutor during

64

closing argument—would additionally require this Court to announce a new rule of constitutional law in this habeas proceeding, which *Teague* forbids:

> In *Teague*, the Court held that federal courts may not create new constitutional rules of criminal procedure on habeas review. A new rule is one which was not "dictated by precedent existing at the time the petitioner's conviction became final." [489 U.S. at 301]. A new rule is created if the rule is, "in light of this Court's precedent, 'susceptible to debate among reasonable minds.'" *O'Dell v. Netherland*, [521 U.S. 151] (1997) (quoting *Butler v. McKellar*, [494 U.S. 407, 415] (1990)). Accordingly, we must examine existing precedent and decide whether, under that precedent, relief is required. If reasonable minds could differ on whether current law requires relief, we may not grant relief without creating a "new rule" barred by *Teague*.

*Vega v. Johnson*, 149 F.3d 354, 357 (5th Cir. 1998). Because existing precedent did not dictate the rule Carter seeks, *Teague* bars his claim from federal merits review.

Carter's reliance on *Mills* is similarly misplaced and *Teague*-barred. The Fifth Circuit has consistently rejected such claims raised by other Texas habeas petitioners. It has based its decisions both on the claim's substantive merits, as well as the conclusion that extending *Mills* to grant relief would require the court to announce and apply a new rule of constitutional law on federal habeas review, which *Teague's* nonretroactivity principle prohibits. See *Druery v. Thaler*, 647 F.3d at 542-45 (rejecting claims based on Sixth, Eighth, and Fourteenth Amendments, and holding relief barred by *Teague*); *Blue v. Thaler*, 665 F.3d at 670 (relief denied based on merits and *Teague*); *Hughes v. Dretke*, 412 F.3d 582,

593-94 (5th Cir. 2005) (denying COA on claims alleging violation of due process and the right to freedom from cruel and unusual punishment, and holding relief barred by *Teague*); *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (rejecting Eighth Amendment challenge) (citing *Jacobs*, 31 F.3d at 1329); *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000) (relief denied based on *Teague* and merits); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) (relief denied on the merits); *Webb v. Collins*, 2 F.3d 93, 95 (5th Cir. 1993) (relief denied based on *Teague*); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996) (relief denied based both on *Teague* and on the merits).  Therefore, both Supreme Court and Fifth Circuit precedent compel rejection of this claim as a matter of law.

Further, *Mills's* holding has no application to states such as Texas which do not require the jury to make threshold factual determinations that limit the mitigating evidence available to be weighed during deliberations on the ultimate sentencing issues.  In *Mills*, the Supreme Court found Eighth Amendment error because jury unanimity instructions created a "substantial probability that individual jurors . . . may well have thought they were precluded from considering any mitigating evidence unless all [twelve] jurors agreed on the existence of a particular such circumstance."  486 U.S. at 384.  Maryland is a "weighing" state with a two-step sentencing process:  the jury was required to first make preliminary factual determinations whether aggravating and/or

mitigating circumstances had been proven and, next, to weigh the proven aggravating and mitigating facts to actually decide the sentence in a particular case. The Court's concern was that a single juror's belief that a mitigating circumstance had not been proven would prevent the entire jury from weighing that factor when deciding the ultimate sentencing issues. *Id.* at 373-74; *McKoy v. North Carolina*, 494 U.S. 433, 438 (1990). But the constitutional infirmity identified by the Court pertained to the first part of this two-step process, which has no counterpart under the Texas statute. Under the Texas system, all jurors can take into account any mitigating circumstance. That is, one juror simply cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable.

Further, nothing in *Mills* or its progeny holds that a state may not require unanimity or some lesser degree of juror agreement on the ultimate sentencing issues in a capital case. To the contrary,

> Juries are typically called upon to render unanimous verdicts on the ultimate issues in a given case. But it is understood that different jurors may be persuaded by different pieces of evidence, even when they agree on the bottom line. Plainly, there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.

*McKoy*, 494 U.S. at 449-50 (Blackmun, J.,concurring) (footnote omitted).

To the extent Carter asserts that the instructions as given do not accurately state Texas law, i.e., that the failure of the jury to render a unanimous

decision in favor of death results in a life sentence, Brief at 34-38, his argument likewise fails to provide a basis for relief. Carter essentially claims entitlement to an instruction authorizing or inviting a jury deadlock. But as the Supreme Court confirmed in *Jones*, the Constitution provides no such entitlement. Both the State and the defendant possess legitimate interests in achieving a verdict, and the Constitution does not guarantee any defendant the right to a deadlocked jury. *See Oregon v. Kennedy*, 456 U.S. 667, 672 (1982) (recognizing the "defendant's interests in having his case finally decided by the jury" as well as the "the public's interest in fair trials designed to end in just judgments.") (internal quotation omitted); *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (noting that a defendant has a "valued right to have his trial completed by a particular tribunal"); *Illinois v. Somerville*, 410 U.S. 458, 463 (1973) (stating that the public's interest in seeing its criminal prosecutions proceed to verdict "need not be forsaken by the formulation of rigid rules that necessarily preclude the vindication of that interest"). Therefore, Carter's claim has no merit.

In sum, because neither the Eighth nor the Fourteenth Amendment necessitates a jury instruction regarding the consequences of a jury's inability to reach a unanimous verdict during capital sentencing hearings, the state court did not unreasonably reject Carter's claim. The AEDPA does not entitle Carter to relief.

## CONCLUSION

For all of the foregoing reasons, the Director respectfully asks that Carters' petition for writ of habeas corpus be denied, and that no certificate of appealability issue with regard to any of the claims raised the instant federal habeas petition.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Assistant Attorney General
Chief, Postconviction
Litigation Division

s/ Kelli L Weaver
KELLI L. WEAVER
Assistant Attorney General
Postconviction Litigation Division
State Bar No. 13551240

*Attorney in Charge

P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 936-1600
Fax No. (512) 936-1280

69

## CERTIFICATE OF SERVICE

I, Kelli L. Weaver, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing Respondent Thaler's Answer with brief in support has been served by using the electronic case filing system of this Court on this the 27th day of March, 2012, addressed to counsel for the Petitioner:

Robin Norris
2408 Fir Street
El Paso, Texas 79923
robinnorris@sbcglobal.net

s/ Kelli L. Weaver
KELLI L. WEAVER
Assistant Attorney General