UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| TILON LASHON CARTER, | § | |
|     Petitioner | § | |
| | § | |
| v. | § | |
| | § | NO. 4:10-CV-00969-Y |
| RICK THALER, | § | (DEATH PENALTY CASE) |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
|     Respondent | § | |

**REPLY TO RESPONDENT'S ORIGINAL ANSWER**

Petitioner, Tilon Lashon Carter, makes the following reply to the Director's answer and brief in support. To the extent that Carter does not specifically address in this reply any part of the Director's answer or argument, he intends to rely entirely on the arguments made and the authorities cited in his original brief, and does not mean to abandon any of the claims or arguments presented in his petition for writ of habeas corpus.

GROUND FOR RELIEF ONE

The Director correctly characterizes Carter's first ground for relief but does not fully comprehend how the evidence supports it. That trial counsel's performance fell below prevailing professional norms is not seriously in dispute. The only issue in this case is the reasonableness of the state habeas court's conclusion that defense counsel's shortcomings

1

did not prejudice Carter. On this question, there is likewise no real doubt that Dr. Charles Harvey, the forensic pathologist belatedly engaged by the defense team, would have testified differently at trial than the Tarrant County Medical Examiner, Dr. Nizam Peerwani, about the cause and manner of James Tomlin's death. In fact, the Court of Criminal Appeals (CCA) expressly rejected the suggestion that Dr. Harvey's conclusions differed from those of Dr. Peerwani only insofar as the former introduced strangulation and the age of the victim as contributing to Tomlin's death. See *Answer* at 36-37. The question of prejudice thus devolves into one of whether other differences between Dr. Harvey and Dr. Peerwani would have lent significant support to the theory Carter's counsel actually advocated in his defense at trial – that Tomlin suffered from a respiratory disorder that made it difficult for him to breathe normally, that he was bound and gagged by Carter with duct tape, that he was left by Carter in a seated position, still alive and conscious, and that, in an attempt to free himself, he fell into a prone position where it became impossible for him to breath, and from which he was unable to extricate himself.

What invalidated this hypothesis from Dr. Peerwani's viewpoint was the presence of a bruise inside Tomlin's lip, a wound typically found in cases where the murder victim has been smothered to death. From this circumstance alone Dr. Peerwani concluded that someone had the conscious objective to kill Tomlin. But Dr. Harvey did not share that view. Although he agreed that the bruising was evidence that Tomlin was smothered, he opined that it could have been caused by someone forcefully placing the duct tape over his mouth.

2

He also opined that the duct tape would have had a smothering effect on Tomlin, a phenomenon not likely to occur in the case of a man who, unlike Tomlin, could breath normally through his nose. In short, the fact that Dr. Harvey agreed with Dr. Peerwani that smothering was a contributing cause of Tomlin's death, does not mean that he agreed with Dr. Peerwani's conclusion that Tomlin was killed intentionally. It is for this reason that the convicting court's finding number 18, which was adopted by the CCA, is unreasonable in light of Dr. Harvey's testimony. Although Dr. Harvey did agree that suffocation was a contributing cause of Tomlin's death, he did not conclude, as the Director contends, that it "was an intentional act sufficient to satisfy the offense as stated in the indictment." *Answer* at 40.

That this is so appears from Dr. Harvey's testimony that Tomlin might have been left in an uncompromised position before rolling onto his stomach in an effort to free himself. The Director characterizes Carter's emphasis on this part of Dr. Harvey's testimony as, by Harvey's own admission, "speculative." *Answer* at 42. But it was clearly Dr. Harvey's position that any attempt to explain how Tomlin came to be in a compromised position would have been speculative because an autopsy cannot reveal such things. Dr. Peerwani, on the other hand, expressed no such reluctance to speculate, opining without much hesitation that Tomlin was deliberately smothered to death. Accordingly, the fact that Dr. Harvey believed any such conclusion to be speculative was, in itself, helpful to the defense because it exposed the unreliability of inferring from Dr. Peerwani's opinion that Tomlin was intentionally

3

murdered.

The Director also maintains that Harvey "rejected the theory that the smothering was due to the placement of duct tape over Tomlin's mouth." *Answer* at 42-44. But this is not quite true, as illustrated by the testimonial excerpts which follow in the Director's brief. All Dr. Harvey indicated is that the duct tape itself would not produce the bruising. He did confirm, however, that placing the tape over Tomlin's mouth could have produced the bruising if done with enough force. And although the force would have to be sustained for some time to cause death, Harvey did not opine that a long duration of sustained pressure would be necessary to cause the bruising. Thus, while Dr. Harvey did not dispute Dr. Peerwani's written report or the conclusion that both smothering and positional asphyxiation were involved, it is clear that he would regard the conclusion, suggested by Dr. Peerwani in his trial testimony, that someone deliberately smothered or attempted to smother Tomlin as speculative.

Finally, the Director argues that other persuasive evidence of Carter's intent to kill, particularly the fact that he made no effort to conceal his identity, effectively rendered the absence of expert testimony like that of Dr. Harvey harmless. *Answer* at 45. But the fact that Carter planned the robbery of Tomlin poorly is hardly enough to overcome critical forensic evidence that Tomlin's death was unintended. Although not quite mentally retarded, Carter is by all accounts of low intelligence. There is no reason to suppose, nor does his past criminal record suggest, that his behavior is rational or well thought out. It is therefore

4

disingenuous, even spurious, to maintain that the question whether Carter intentionally caused Tomlin's death actually depended in this case on anything other than forensic science. Accordingly, for Carter's trial counsel to attempt a defense as to the cause of death in these circumstances without the assistance of a forensic pathologist, based on careful, extensive pretrial consultation and the development of trial testimony, such as that expressed by Dr. Harvey at the evidentiary hearing of Carter's state habeas corpus application, was fatal to any contention that Carter did not intentionally cause the death of Tomlin, and therefore prejudicial within the meaning of *Strickland v. Washington*, 466 U.S. 668 (1984).

## GROUND FOR RELIEF TWO

Arguments about the effect of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), on the burden of proof under the Texas capital sentencing scheme, and especially as regards the mitigation special issue, inevitably devolves into a dispute about whether the United States Constitution will permit such burden to be placed on capital murder defendants. Since the Director's brief here is no different in that regard, it is worth emphasizing as often as possible that Carter does not intend to engage in such dispute. He concedes that capital defendants, himself included, may be burdened with proving the existence of mitigating circumstances in order to avoid a death sentence which would otherwise be consistent with the guided discretion required by settled Supreme Court precedent. What he does not concede is that Texas has actually assigned the burden in that way, or that a death sentence may lawfully be imposed under Texas law without an

5

affirmative finding by the jury that any mitigating circumstances disclosed by the evidence at trial are insufficient to warrant a sentence of life imprisonment

The first question to be asked under *Apprendi* and *Ring* is always what the jury's verdict authorizes in the absence of any further finding. Because Texas law, on its face, plainly does not authorize a death sentence without a further finding by the jury that mitigating factors are insufficient to warrant a life sentence. it is apparently subject, like any other factual prerequisites, to the general rule articulated by the Supreme Court in those cases. Nevertheless, the Director argues that Supreme Court jurisprudence did not "contemplate" that the Sixth Amendment's reasonable-doubt requirement would apply to the Texas mitigation special issue. *Answer* at 50. But the rule is one of general application to a potentially unlimited variety of punishment factors in criminal prosecutions of all kinds. The fact that it has not yet been applied to the Texas mitigation special issue is of no consequence.

Literally any finding whatsoever upon which the assessment of punishment depends, other than prior convictions alleged for enhancement, must be proved by the state beyond reasonable doubt under settled Supreme Court jurisprudence. We need not await every creative effort of the legislature to devise new criteria for the assessment of greater punishments before concluding that the prosecution is required by the United States Constitution to prove them beyond reasonable doubt. Accordingly, the argument that Carter's claim is *Teague*-barred can be effectively reduced to the merits of the claims itself.

See *Answer* at 59. If the rule of *Apprendi* and *Ring* is applicable to the mitigation special issue, the rule of *Teague* does not bar relief. If, on the other hand, it isn't applicable, there is no need to rely on *Teague* at all. *Teague v. Lane*, 489 U.S. 288 (1989).

The Director contends that the mitigation special issue is neither an element of capital murder nor a circumstances which aggravates the offense, but only something "which allows the defendant to escape the maximum penalty[.]" *Answer* at 49. But this contention is plainly and obviously false on its face. Capital defendants do not escape the death penalty by offering evidence in mitigation. Rather, the prosecution must prove the insufficiency of mitigating circumstances before it can obtain a death sentence. Mitigating circumstances in this context are not merely such things as the defendant may seek to prove through evidence at the punishment phase of trial, but include such circumstances of the offense and conduct of the defendant as may appear from the state's own proof of guilt to extenuate his fault in any degree. Requiring the prosecution to bear the burden of persuading the jury that such circumstances do not warrant a life sentence is, without serious question, the plain meaning the statutory language. To suggest that it means instead that the defendant must prove the existence of specific mitigating circumstances in addition to what may already exist in the record, or to persuade the jury that such circumstances warrant a life sentence, just because the United States Constitution would not be offended by it, is a transparent perversion of the statute's clear purpose.

Certainly, nothing in the Eighth Amendment precludes that state from, in the words

of *Walton v. Arizona*, "specifying how mitigating circumstances are to be proved." *Answer* at 57. But it follows from this that Texas may require, if it wants, not that the defendant prove mitigating circumstances to the jury's satisfaction, but instead that the prosecution persuade jurors that extant mitigating factors are insufficient for a life sentence. Carter does not contend that Texas is constitutionally barred from requiring proof that mitigating factors are sufficient for a life sentence, or from assessing the death penalty if the jury fails to find that they are. He only contends that Texas has plainly not done so, and that failure to find them insufficient necessarily results in a life sentence.

The Director quotes language from the Fifth Circuit to the effect that "a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death." *Answer* at 55. Of course, a finding that there are mitigating circumstances can never increase a sentence to death. But, in Texas, such a finding does not reduce it from death either. Rather, a finding that such mitigating circumstances, if any, as do exist in the record are not sufficient for a life sentence is what authorizes a sentence of death. Without a finding that such circumstances are insufficient, a sentence of death may not be pronounced. Life imprisonment, not the death penalty, is the default position under Texas law.

The Director points out that Carter was fully notified of the offense with which he was charged by the indictment and that no attempt was made a trial to bypass Carter's Sixth Amendment tight to have the jury determine his eligibility for the death penalty. *Answer* at 51. That is, of course, true. But notice and death-eligibility are not the issue here. Rather,

8

it is the standard of proof required by the Sixth Amendment in criminal prosecutions that was violated, and is routinely violated, in Texas prosecutions for capital murder. Because the Director does not dispute that Carter could not be sentenced to death under Texas law without a specific finding by the jury that any mitigating factors were insufficient to warrant a life sentence, it necessarily follows from settled Supreme Court precedent that such finding must be made beyond reasonable doubt.

Finally, The Director trots out the old canard that it is absurd to require proof of a negative. *Answer* at 57. But prosecutors are required to prove negatives all the time, as emphasized by Carter in his original brief. Besides, as already stated, the prosecution is not required to prove the absence of evidence, or even the absence of mitigating factors, but only that such factors, to the extent they exist at all, are insufficient to warrant a life sentence. This merely calls upon the jury to make a judgment about the balance of aggravating and mitigating factors which favors a life sentence unless the mitigating factors are determined by the jury to be too weak for the more lenient sentence. There can be no question that the jury is required by Texas law affirmatively to decide just that -- that they are too weak.

No matter how often the Director maintains that mitigating circumstances can logically function only to reduce a sentence from death to life in prison, it is plain that the Texas scheme does not actually function in that way. Instead, it is unquestionably the case that a death sentence is never available under the Texas capital sentencing law unless the jury specifically finds that any mitigating factors disclosed by the evidence at either phase of trial

9

are insufficient for a life sentence. Without a favorable jury finding on this question, a death sentence is never authorized by Texas law.

GROUND FOR RELIEF THREE

The Texas capital jury instruction, and accompanying verdict form, which declares that a verdict for the defendant on the special punishment issues is not authorized unless at least ten jurors agree to it is manifestly intended to mislead jurors about the consequence of their failure to agree. It is the antithesis of the so-called *Allen*-charge, universally approved throughout American jurisdictions, which encourages unanimity by warning of the time-consuming and expensive alternative – another trial. But such a warning cannot honestly be given at the punishment phase of a Texas death penalty case because it is not true that the failure to agree will ever result in another trial. Indeed, such an instruction would be inconsistent with the statutory admonition that jurors may not be told the consequence of their failure to agree. If that were the end of it, there would be no problem. Tell the jury only that unanimity is required for a verdict in favor of the prosecution, and the jurors are not been misled. Tell them that ten votes are required for a life sentence, and they will likely think it's so. But it isn't, and fooling them into thinking that it is can have no possible consequence other than more death sentences.

Not surprisingly, the Director relies heavily on the decision in *Jones v. United States*, 527 U.S. 373 (1999), wherein the Supreme Court emphasized that our system of justice traditionally encourages unanimity on the question of life or death as an expression of the

community's conscience. *Answer* at 63. Of course, the state has a strong interest in securing unanimous verdicts where unanimous verdicts are required by law. But, where the law does not require a unanimous verdict, the state has no interest in one. Rather, the interest of the state is more accurately characterized as an interest in verdicts upon which a judgment may lawfully be entered. Carter does not contend that he has any legally supportable interest in blocking a valid judgment, or even in securing a hung jury. But it is a mistake to characterize a Texas jury which fails to secure at least a majority of ten votes in the defendant's favor as a hung jury in the ordinary sense, since it does not prevent entry of a valid judgment in the case. Leading jurors to think that it will, by misinforming them that at least ten votes are necessary for a verdict, and by suppressing the truth that it is not so, the state of Texas manifestly puts pressure on the jurors to return a verdict which requires a sentence of death.

Likewise, the argument, again based on language from *Jones,* that jurors need not be informed of what legal consequence will follow from their failure to agree because the jury, in such event, has been "unable to fulfill its role," does not directly speak to the question presented here. See *Answer* at 64. Shall we take this to mean that the jury's role is to reach agreement upon facts which are altogether without legal consequence? Is it really the law in Texas that the conscience of the community is better expressed by a verdict of 11-1, 9-3, 8-4, or 7-5 than it is by a verdict of 10-2, when all of these results have exactly the same legal consequence? It is nothing but a canard to pretend that achieving the agreement of at least ten jurors through what is most usually an excruciatingly difficult, and often a protracted,

deliberative process, has as its purpose any meaningful expression of community conscience.

As for the contention that Carter's claim is *Teague*-barred, the best response is that the Constitution clearly forbids misleading jurors about their role in the adjudication process or about the consequences of their verdict. The fact that legislatures never seem at a loss for new, more creative, or less obvious means to obfuscate the jury's proper role is no sound basis for the claim that the newness of its strategy is entitled to greater constitutional protection.

## CONCLUSION

For the foregoing reasons, this Court should, after holding an evidentiary hearing, set aside Petitioner's conviction for capital murder.

s/ Robin Norris
ROBIN NORRIS
Texas Bar No. 15096200
2408 Fir Street
El Paso, Texas 79925
(915) 329-4860  Voice
robinnorris@sbcglobal.net

ATTORNEY FOR PETITIONER

**CERTIFICATE OF SERVICE**

I hereby certify that on April 26, 2012 I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means:

Kelli L. Weaver
Assistant Attorney General of Texas
Capital Litigation Division
209 W. 14th Street
Austin, Texas 78701

                                                     s/ Robin Norris
                                                     ROBIN NORRIS